## COMMONWEALTH vs. FRANCIS P. SUMNER.

Worcester. April 5, 1984. — July 5, 1984.

Present: GRANT, CUTTER, & BROWN, JJ.

*Rape. Kidnapping. Practice, Criminal,* Continuance, Fair trial, Comment by prosecutor. *Evidence,* Fresh complaint, Other offense, Testimony before grand jury, Judicial discretion.

At the trial of indictments charging aggravated rape and kidnapping, there was sufficient evidence, including testimony of the victim, together with testimony of her mother and of other persons, including a doctor, who observed her injuries, and photographs of her taken shortly after the attack, to warrant the denial of the defendant's motion for a required finding of not guilty of the crime of aggravated rape based on serious bodily injury to the victim. [351-352]

At the trial of a defendant on charges of rape and kidnapping, there was sufficient evidence concerning the defendant's confinement of the victim in an apartment for two hours or more, after placing his automobile in a manner blocking the victim's own vehicle in the driveway of the apartment, to warrant a finding that a kidnapping had occurred separate and apart from the commission of the rape. [352-354]

INDICTMENTS found and returned in the Superior Court Department on January 13, 1982.

The cases were tried before *Young,* J.

*Richard J. Shea* for the defendant.

*Lynn Morrill Turcotte,* Assistant District Attorney, for the Commonwealth.

CUTTER, J. Sumner appeals from convictions, after a trial before a Superior Court judge and a jury, upon indictments for aggravated rape (G. L. c. 265, § 22[a], as amended[1]) and kidnapping (G. L. c. 265, § 26, as amended), each alleged to have taken place on October 20, 1981. The trial began on June

---

[1] Pertinent portions of the statutes cited in the text are quoted in Appendix 1 of this opinion.

18, 1982, and ended with verdicts of guilty on July 9, 1982. Sumner was given concurrent sentences to M.C.I., Walpole, of fifteen to eighteen years on the rape charge and of nine to ten years on the kidnapping charge.

Only one issue calls for extended discussion, viz., whether the judge should have granted Sumner's motions for required findings of not guilty. Other insubstantial points argued are discussed in Appendix 2 of this opinion.

We consider whether the Commonwealth had presented evidence (taking into account all permissible inferences) "that could have satisfied a rational trier of fact of each . . . [essential] element" of each offense charged beyond a reasonable doubt. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). See also *Commonwealth* v. *Shaheen*, 15 Mass. App. Ct. 302, 306 (1983). As to this, the victim's testimony is summarized in paragraphs (a) to (e), below.

(a) Prior to October 20, 1981, the victim, then twenty-one years old, had a friend's Cadillac automobile painted at Sumner's auto body shop. On the twentieth, she returned to the shop to have some work completed. While there, she talked with Sumner (obviously older than the victim, for his seventeen-year old son was a defense witness). In the course of this conversation she arranged to inspect with Sumner an apartment at 41 Rockland Road, Auburn, which Sumner was trying to let, with the thought that her "girl friend" might be interested in it. That afternoon she went, in the Cadillac, to the apartment, where Sumner joined her in his automobile. They looked at the apartment. As they were leaving, Sumner asked her if she "would clean it for him and he would pay" her. She agreed to do this and to pick up the keys at Sumner's place of business about 7 P.M.

(b) She returned to her parents' house about 4:45 P.M. She told her mother and sister her plans, and arrived at Sumner's body shop in the Cadillac about 7:20 P.M. Sumner told her to meet him at the apartment and to "park in back where the driveway is." Sumner met her in his own automobile and let her into the apartment. He then asked her what she needed for the cleaning work. She told him what she required and gave

him a dollar to buy some "Kool" cigarettes. She started the cleaning.

(c) Sumner left and returned with the requested items. He again left after she had told him that she "had to be back home for eight-thirty." She cleaned the apartment and dusted for about an hour. Sumner then returned, "said the place looks good and put twenty dollars on the table."

(d) The victim started toward the door and Sumner "got in front of . . . [her] and locked three locks on the door." Sumner "tried to start kissing" her and she "pushed him away." After some struggling, Sumner said, "Just give it to me and I won't hurt you." Then he said, "Give it to me or I'll kill you." She was crying but was unable to push him away. Sumner started choking her and she "screamed hoping somebody upstairs would hear." Sumner choked her again, so that she was "gasping for air". He then took off her clothes and underclothes, grabbed her arm, and pulled her into the bedroom. There he turned a stereo on medium volume, took off his clothes, held her down with his knees, and for "about an hour and a half" engaged repeatedly in various sexual activities including instances of penetration, while she was "too scared to" scream.

(e) Eventually, Sumner told her she could go. She went out, entered the Cadillac and locked the doors. She "had to wait because he had told . . . [her] before . . . [she] left that his car was blocking . . . [hers] in the driveway." It was then 12:05 A.M. on October 21 by the clock in the Cadillac. When Sumner moved his automobile, she went to her "boy friend's house" and, after some conversation with his mother, she called the Worcester police, who took her "to the hospital about five of one."[2]

The judge concluded properly that a required finding of not guilty could not be ordered in view of the foregoing testimony of the victim, together with (a) testimony of her mother and of

---

[2] There was conflicting evidence about where Sumner was and about where the victim was after 8 P.M. on October 20, 1981. The evidence most favorable to the Commonwealth was consistent with the victim's testimony. The jury was not obliged to believe (and obviously did not believe) the evidence conflicting with the victim's testimony and the alibi evidence.

persons, including a doctor, who saw her at the hospital and observed her bruises, the scrapes on her throat and back, and her emotionally disturbed condition, and (b) photographs of her person, taken on the night of October 20-21. He could also regard as sufficient to establish beyond a reasonable doubt to a rational trier of fact the charge of aggravated rape based on "serious bodily injury." See the discussion in *Commonwealth* v. *Sherry*, 386 Mass. 682, 687-688, 694-695 (1982). See also *Commonwealth* v. *Whitehead*, 379 Mass. 640, 650 n.8 (1980).

A rational trier of fact could also conclude beyond a reasonable doubt that Sumner was guilty of the crime of kidnapping (see G. L. c. 265, § 26, as amended, quoted in Appendix 1) because of Sumner's conduct in locking the victim into the Rockland Road apartment for two hours or more, after placing his own automobile, for the first time (known to the victim) of the three occasions when he had been on the premises with the victim that day, so that she could not leave in the Cadillac. Sumner, on the victim's testimony, could have been convicted of kidnapping, even if the jury had not believed her testimony on the rape indictment. If they did believe her rape testimony, the jury reasonably could have found (although the issue is, perhaps, close) that, in duration, planning, and execution, her confinement exceeded restraint which was merely incidental to the rape. See *Commonwealth* v. *Reilly*, 5 Mass. App. Ct. 435, 438 (1977); *Commonwealth* v. *Talbot*, 5 Mass. App. Ct. 857 (1977); *Commonwealth* v. *Mack*, 5 Mass. App. Ct. 886, 887 (1977); *Commonwealth* v. *LaPierre*, 10 Mass. App. Ct. 641, 645 n.3 (1980); *Commonwealth* v. *Vasquez*, 11 Mass. App. Ct. 261, 267-268 (1981). Compare *People* v. *Cassidy*, 40 N.Y. 2d 763, 767-768 (1976).[3]

Sumner contends that the evidence offered to prove kidnapping was so closely related to that offered to prove rape as to

---

[3] See Model Penal Code § 212.1 (Official Draft 1980), which provides that a "person is guilty of kidnapping . . . if he unlawfully confines another for a substantial period in a place of isolation . . . (c) to facilitate commission of any felony . . . ." The discussion under this section of the code discloses difficulties which may be involved where the crimes of rape and kidnapping are closely related and are tried together.

make improper separate convictions on the two indictments. As indicated above, "we think there was sufficient evidence concerning . . . [Sumner's] confinement of the victim . . . to warrant the jury in finding that a kidnapping had occurred separate . . . from the . . . rape." See *Commonwealth* v. *Vasquez*, 11 Mass. App. Ct. at 267-268. Even if the charges might prove to be in some respects duplicitous under principles discussed in *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306-309 (1972), and in *Commonwealth* v. *Crocker*, 384 Mass. 353, 357 (1981), the judge could not have ordered required findings of not guilty. The Commonwealth was not obliged to elect in advance the charge on which it intended to proceed. *Commonwealth* v. *Jones*, 382 Mass. 387, 395 n.10 (1981). As was recognized in the *Jones* case at 394-395, in the event of indictments for two offenses which must be held duplicitous, the "proper approach . . . [would be] to submit . . . [both] charges to the jury and, if guilty verdicts were returned on more than one, to dismiss the less serious charge." See *Commonwealth* v. *Overton*, 12 Mass. App. Ct. 996, 997 (1981); *Commonwealth* v. *Shuman*, 17 Mass. App. Ct. 441, 449-452 (1984). See also the discussion in *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 661-663 (1979). Thus, even if the kidnapping charge were to be treated as merged into the rape charge, only one of Sumner's convictions and concurrent sentences would need to be set aside.[4] The concurrent sentences were well within the limits permitted for violations of G. L. c. 265, § 22(*b*), unaggravated rape, see *Commonwealth* v. *Sherry*, 386 Mass. at 694-695, which is expressly made by the 1980 form of § 22 "a lesser included offense to . . . [the offense] described" in § 22(*a*). The conviction of rape, § 22(*b*), could thus stand even if the evidence were not sufficient to show either "serious

---

[4] We see no occasion to consider whether there is any analogy of (a) the statutory provisions (see Appendix 1) of G. L. c. 265, § 22 (*a*), and c. 277, § 39, with respect to aggravated rape occurring during a violation of c. 265, § 26, to (b) the statutory situation considered in *Commonwealth* v. *Cameron*, 385 Mass. 660, 670-671 (1982), where *concurrent* (but not consecutive) sentences were allowed to stand in convictions for felony-murder and also for the underlying felony. See *Commonwealth* v. *Wilson*, 381 Mass. 90, 124 (1980).

bodily injury" or a kidnapping under § 26. We hold that the evidence was sufficient to show both "serious bodily injury" and a kidnapping. The judge properly denied motions for required findings of not guilty.

The numerous issues discussed in Appendix 2, considered either separately or in the aggregate, do not warrant reversal. The judgments are affirmed.

*So ordered.*

APPENDIX 1.

### CERTAIN STATUTORY PROVISIONS RELATING TO KIDNAPPING AND RAPE

General Laws c. 265, § 22, as appearing in St. 1980, c. 459, § 6, reads in part (emphasis supplied): "(*a*) Whoever has sexual intercourse . . . *with a person*, and compels such person to submit *by force* and against his will, or compels such person to submit by threat of bodily injury and if . . . such sexual intercourse . . . results in . . . serious bodily injury . . . *or is committed during the commission* or attempted commission of an offense *defined in section . . . twenty-six of this chapter*, . . . shall be punished by imprisonment in the state prison for life or for any term of years.

[Second par. of subsection (*a*) omitted.]

"(*b*) Whoever has sexual intercourse . . . with a person and compels such person to submit by force and against his will, or compels such person to submit by threat of bodily injury, shall be punished by imprisonment in the state prison for not more than twenty years; and whoever commits a second or subsequent such offense shall be punished by imprisonment in the state prison for life or for any term of years.

[Second par. of subsection (*b*) omitted.]

"For the purposes of prosecution, the offense described in subsection (*b*) shall be a lesser included offense to that described in subsection (*a*)."

Chapter 265, § 26, as amended by St. 1979, c. 465, § 1, reads (emphasis supplied):

"Whoever, without lawful authority, forcibly, or secretly confines or imprisons another person within this commonwealth against his will . . . , with intent . . . to cause him to be secretly confined . . . against his will . . . shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than one thousand dollars and imprisonment in jail for not more than two years . . . . Whoever commits

any offence described in this section with the intent to extort money or other valuable thing thereby shall be punished by imprisonment in the state prison for life or for any term of years."

General Laws c. 277, § 39, as amended through St. 1980, c. 459, § 8, reads in part (emphasis supplied):

"The words used in an indictment may, except as otherwise provided in this section, be construed according to their usual acceptation in common language; but if certain words and phrases are defined by law, they shall be used according to their legal meaning.

"The following words, when used in an indictment, shall be sufficient to convey the meaning herein attached to them . . . .

"*Aggravated Rape.* — Sexual intercouse or unnatural sexual intercourse by a person with another person who is compelled to submit *by force and against his will* or by threat of bodily injury; and either such sexual intercourse or unnatural sexual intercourse results in or is committed with acts resulting in serious bodily injury, . . . or *is committed during the commission* or attempted commission *of an offense defined in section . . . twenty-six of chapter two hundred and sixty-five* . . . ."

### APPENDIX 2.

Other points argued are discussed below, essentially in the order in which they are set out in the brief of Sumner's counsel.

1. The judge properly denied Sumner's motion for a continuance and change of venue because of pretrial publicity. This is a matter within the discretion of the judge. See *Commonwealth* v. *Jackson,* 388 Mass. 98, 108-109 (1983); *Commonwealth* v. *Bianco,* 388 Mass. 358, 367-368 (1983); *Commonwealth* v. *Burden,* 15 Mass. App. Ct. 666, 672 (1983); Smith, Criminal Practice and Procedure, §§ 2359-2368 (2d ed. 1983). About two months of continuances in fact were granted from the date of early newspaper accounts. Publicity in some degree had subsided before the trial began. Although the seating of jurors was not included in the trial transcript in the original appendix, available excerpts from it (later submitted) show that the judge used care in selecting and questioning jurors. Sumner used only fifteen of his sixteen peremptory challenges. See Mass.R.Crim.P. 20(c), 378 Mass. 890-891 (1979). He has not shown that it was impossible to obtain a proper jury to give him a fair trial.

Sumner also claims prejudice because the judge did not grant a mistrial when a copy of a local newspaper, containing an account of the trial on the previous day, was discovered in the jury room. The judge found the article to be an accurate account. He then conducted an individual voir dire of the jurors who knew about the presence of the article and concluded that their impartiality had not been affected. He wisely followed the course recommended in such circumstances in *Commonwealth* v. *Jackson,* 376

Mass. 790, 799-801 (1978). He did not abuse his discretion. *Commonwealth* v. *Cameron*, 385 Mass. 660, 668 (1982).

2. The judge in his discretion reasonably denied a view on the eighth day of the trial after there had been substantial testimony and photographic evidence about pertinent premises. See *Commonwealth* v. *Curry*, 368 Mass. 195, 198 (1975); Liacos, Handbook of Massachusetts Evidence 398 (5th ed. 1981). See also G. L. c. 234, § 35.

3. Sumner contends that certain statements by the victim were improperly admitted as "fresh complaint" because a police investigation was already under way. The statements were admitted solely for the limited purpose of corroboration of the victim's testimony (see *Commonwealth* v. *Edgerly*, 13 Mass. App. Ct. 562, 569 [1982]; see also somewhat related decision, 390 Mass. 103 [1983]) and appear to have been within the principles set out in *Commonwealth* v. *Bailey*, 370 Mass. 388, 391-397 (1976). Some testimony was purely cumulative in effect. See *Commonwealth* v. *Izzo*, 359 Mass. 39, 43 (1971); *Commonwealth* v. *Blow*, 370 Mass. 401, 404-406 (1976). Other testimony concerned statements made to a physician for purposes of diagnosis. See Liacos, Handbook of Massachusetts Evidence 346-348 (5th ed. 1981). Each statement was part of a series of complaints, all within a few hours of the conduct charged. See *Commonwealth* v. *Howard*, 355 Mass. 526, 528-530 (1969). Compare *Commonwealth* v. *Spare*, 353 Mass. 263, 264-266 (1967). We perceive no prejudice.

4. The judge supervised "sanitizing" the records of the hospital to which the victim was taken shortly after the alleged rape. Sumner has shown no prejudice from admitting the sanitized records. See *Commonwealth* v. *Izzo*, 359 Mass. at 43. Compare *Commonwealth* v. *McDuffie*, 16 Mass. App. Ct. 1016, 1017 (1983), where much of the report was inadmissible under G. L. c. 233, § 79, and the report was inappropriately used in argument by the prosecutor in that case.

5. The judge reasonably received evidence of Sumner's violence exhibited in the presence of a witness, Charles. L. Parks, after the latter's cross-examination, not for its tendency to show that Sumner had committed the alleged crimes, but as evidence of Park's state of mind and fears which led him to change his testimony from an earlier account he had given of Sumner's presence elsewhere than at the scene of the alleged rape on the relevant night. See *Commonwealth* v. *Errington*, 390 Mass. 875, 880-882 (1984). See also *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 815-817 (1973); *Commonwealth* v. *Dougan*, 377 Mass. 303, 307-310 (1979). Ample limiting instructions were given.

6. Similar reasons supported the judge's admission of testimony through a witness, Bruce Davenport, concerning, among other things, an alleged statement by Sumner to Davenport that Sumner once had been involved with the Mafia. See *Commonwealth* v. *Perez*, 390 Mass. 308, 317 (1983). After a voir dire examination, careful limiting instructions were given.

7. One witness, Officer Thomas Wooldridge, called by the prosecutor, was asked if he had been to Sumner's house. The reply was "only on[e]

occasion on an arrest with Officer Westerman." Earlier testimony had disclosed that Sumner had been arrested at his place of business for the alleged offenses on trial. Officer Wooldridge's answer thus suggested that Sumner at some other time had been arrested for a different alleged offense. The judge acted within his discretion (see *Commonwealth* v. *Simmonds*, 386 Mass. 234, 241 [1982]) in denying a mistrial and properly struck the question and answer. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 223-224 (1983). An offer to give a limiting instruction was refused by defense counsel. There was no testimony by Officer Wooldridge suggesting an admission (of the type considered in *Commonwealth* v. *Nassar*, 351 Mass. 37, 44-46 [1966]) by Sumner of other criminal conduct. Other questions concerning when particular witnesses first learned of Sumner's arrest were the subject of defense objections. These, however, have not been presented in Sumner's behalf sufficiently to rise to the level of appropriate appellate argument. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *Commonwealth* v. *Whitford*, 16 Mass. App. Ct. 448, 452 (1983). The dates when particular witnesses had learned of Sumner's arrest were relevant to whether they had come forward promptly with (or may have contrived) possibly exculpatory alibi testimony.

8. Sumner contends that exculpatory information was not furnished to him by the prosecution to his prejudice.

(a) A witness, Bruce Davenport, pointed out that information in a statement by him (furnished by the prosecutrix to defense counsel) was in part erroneous and had not been corrected by the prosecutrix. The judge, well within the range of his discretion, denied a mistrial where defense counsel failed to point out any prejudice which had resulted from the error, which was not shown to have been known to the prosecutrix until shortly before cross-examination began. See *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261-265 (1980). Compare *Commonwealth* v. *Ellison*, 376 Mass. 1, 20-26 (1978); *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 308-310 (1984).

(b) Sumner complains that the Commonwealth did not reduce to writing conversations between State police officers and possible witnesses. The pretrial conference report did not require this, and no agreement to do so was shown. See *Commonwealth* v. *Spann*, 383 Mass. 142, 148-150 (1981). See also Mass.R.Crim.P. 14(d), 378 Mass. 881 (1979). No prejudice to Sumner from any alleged failures to disclose any material has been adequately argued or established.

9. George Ayik had testified at the probable cause hearing. At trial he was called as a witness out of the presence of the jury. There, on advice of counsel, he claimed his privilege against self-incrimination because there were then pending charges against him for perjury in an earlier stage of this very matter. The judge sustained his claim of privilege and treated him as unavailable to testify (that he had seen Sumner at his garage on the night of the alleged rape). His testimony at his probable cause hearing was admitted

at Sumner's counsel's request. See *Commonwealth* v. *Canon*, 373 Mass. 494, 499-501 (1977). Sergeant Eugene Mattioli of the State police then testified over objection (to show a prior inconsistent statement by Ayik) that, in a conversation with Ayik on April 7, 1982, Ayik had admitted that he had not been in Sumner's garage on October 20, 1981, and had never been there when five named persons (including Sumner) were also all there. This was proper in the judge's discretion. See *Commonwealth* v. *Hesketh*, 386 Mass. 153, 160-161 (1982); *Commonwealth* v. *Simmonds*, 386 Mass. 234, 242 (1982); Liacos, Handbook of Massachusetts Evidence 135-137 (5th ed. 1981 & Supp. 1983). The judge then admitted so much of Ayik's grand jury testimony as seemed to deal with the conversation between Officer Mattioli and Ayik on April 7. (This, in the circumstances, may have seemed an available method of attempting to rehabilitate Ayik.) The judge, however, refused to admit the balance of Ayik's testimony before the grand jury. See the discussion in *Commonwealth* v. *Martinez*, 384 Mass. 377, 381-384 (1981), and *Commonwealth* v. *Bookman*, 386 Mass. 657, 662, 664 (1982). All this testimony dealt with an impeachment controversy which the judge reasonably could regard as somewhat remote and collateral. His action appears to have been a conscientious, practical exercise of discretion. See Liacos, Handbook of Massachusetts Evidence 165-166 (5th ed. 1981).

10. (a) The victim gave two packages of "Kool" cigarettes to the Auburn police on October 22, 1981. At trial, she testified that these had been purchased for her by Sumner on the night of the 20th while she was cleaning the Rockland Road apartment.

Michael Maroney on October 20, 1981, was a clerk at the Cumberland Farms store on Webster Street, Worcester, on duty from 5 P.M. to 10 P.M. At trial, on June 22, 1983, Maroney identified Sumner as a man who had come into the store on the evening of October 20, 1981, to buy some cleaning items and a carton of "Kool" cigarettes which Maroney obtained for him from a back room. Maroney also testified that the cigarettes he sold at Cumberland Farms at that time had a code number 62 upon them. Maroney did not know whether other Cumberland Farms stores in Massachusetts used this number. Charles Brink, security supervisor for Cumberland Farms, called by the defense on June 28, 1982, testified that the number 62 was a tax code number used on all cigarettes sold in Massachusetts by Cumberland Farms.

The cigarettes (two packages) were introduced, at the request of the defense, as an exhibit. Examination of the original exhibit shows the "2" clearly but it is hard to tell whether the first digit is "6" or "3." The judge decided that this should be left to the jury to decide. He ordered marked only for identification a package of cigarettes, offered as purchased at a Cumberland Farms store (not identified) by an unspecified person, showing a different type and size of number. The judge, when final arguments were about to commence, reasonably refused to admit this package in evidence or to reopen the evidence after a brief continuance, see *Commonwealth* v.

*Watkins*, 375 Mass. 472, 490 (1978), to obtain further testimony from Cumberland Farms. He also refused a mistrial, clearly a matter of discretion. *Commonwealth* v. *Simmonds*, 386 Mass. at 241. There was no "high degree of necessity" for a new trial. See *Commonwealth* v. *Dustin*, 391 Mass. 481, 484-486 (1981). Cf. *Commonwealth* v. *Reinstein*, 381 Mass. 555, 560-561 (1980). On this largely collateral matter, there was no risk of a miscarriage of justice and, if there was objection, it was clearly proper for the judge to conclude that defense counsel should have dealt with the questions at a much earlier stage of the trial.

(b) We think that Sumner, although afforded an ample voir dire, did not sustain his burden of showing that the out-of-court photographic identification of Sumner by Maroney on October 26, 1981, was impermissibly suggestive or gave rise to any significant likelihood of misidentification. See *Commonwealth* v. *Venios*, 378 Mass. 24, 26-30 (1979). See also *Commonwealth* v. *Hicks*, 17 Mass. App. Ct. 574, 577-584 (1984). The judge correctly ruled that the identification was admissible.

11. It was within the judge's discretion, *Commonwealth* v. *Watkins*, 375 Mass. at 489-490, to exclude as untimely on surrebuttal telephone company records of highly doubtful relevance in an effort to impeach a prosecution witness who had testified in rebuttal in a manner which might impeach the testimony of a defense witness. See Liacos, Handbook of Massachusetts Evidence 65 (5th ed. 1981).

12. The judge moved promptly upon objection to tell the jury to disregard an unwise reference in argument by the prosecutrix to the fact that certain hospital records were as available to the defense as to the police. The judge, on the prosecutrix's objection, at first had excluded these hospital records as "wholly collateral and immaterial." Perhaps because the prosecutrix's remark might be taken as suggesting that the records did not exist, the judge admitted them as an exhibit and, in his charge, he referred to the exhibit saying "Exhibit 48 . . . purports to be the hospital record of one . . . Mara. I have determined, though mention was not made of that while we were taking evidence, that in the interest of justice you should have that exhibit." We think the brief reference in argument to the records, although better left unsaid, was promptly and adequately corrected and was not prejudicial. See discussion in *Commonwealth* v. *Dougan*, 377 Mass. 303, 311-312 (1979).