COMMONWEALTH *vs.* JOHN J. SHEA.

No. 93-P-1066.

Plymouth. September 12, 1994. - January 5, 1995.

Present: PERRETTA, DREBEN, & GILLERMAN, JJ.

*Practice, Criminal,* Continuance. *Evidence,* Chalk drawing, Videotape. *Homicide. Attempt. Kidnapping. Assault and Battery by Means of a Dangerous Weapon.*

At a criminal trial, the judge did not abuse his discretion in denying the defendant's motion for a continuance of trial for the purpose of securing further psychoneurological testing and evaluation, and in any event the defendant demonstrated no prejudice, where his neurological condition was fully presented to the jury at trial through the testimony of a psychiatrist. [8-11]

At a criminal trial, the judge properly allowed two videotapes to be used as chalks to illustrate the victims' testimony and to show what the defendant saw and experienced as that was relevant to his intent. [11-13]

Evidence at the trial of indictments for attempted murder by drowning was sufficient to warrant the reasonable inference that the defendant intended that the victims drown. [14]

Evidence at a criminal trial supported the defendant's convictions for kidnapping. [14-15]

The ocean is not an instrumentality capable of use as a weapon for purposes of a prosecution under G. L. c. 265, § 15A (assault and battery by means of a dangerous weapon); accordingly a criminal defendant's motion for required findings of not guilty on indictments under that statute alleging the ocean as the weapon should have been allowed. [15-16]

INDICTMENTS found and returned in the Superior Court Department on July 12, 1991.

The cases were tried before *Cortland A. Mathers,* J.

*Edward J. O'Brien* for the defendant.

*John E. Bradley & Kelly-Anne Doherty,* Assistant District Attorneys, for the Commonwealth.

PERRETTA, J. On the afternoon of June 15, 1991, the defendant and his friend invited two women who were sun-

bathing on the banks of the Charles River to board the de-
fendant's boat and go for a ride. Once the women were
aboard, the defendant headed out to the open sea. An hour
later and about five miles off shore from Boston, he stopped
the boat, disrobed, and made sexual remarks and advances
toward the women. He ignored all requests that he dress and
stop his offensive behavior. When the women demanded that
he return them to Boston, he threw them overboard and
drove away without a backward glance. The women were
rescued after managing to swim within shouting distance of a
sailboat. On evidence of these acts, a jury found the defend-
ant guilty, as to each woman, of kidnapping, attempted mur-
der, assault and battery by means of a dangerous weapon
(the ocean), and indecent assault and battery. The defendant
argues on appeal that the trial judge erroneously denied (1)
his request for a continuance of the trial; (2) his motion in
limine by which he sought to preclude the Commonwealth's
use of a videotape showing the ocean from the perspective of
the women in the water and the defendant on his boat; and
(3) his motion for required findings of not guilty on all the
indictments. Although we conclude that the ocean is not a
dangerous weapon within the meaning of G. L. c. 265,
§ 15A, we affirm the kidnapping and attempted murder
convictions.[1]

1. *The motion for a continuance.* Trial counsel was ap-
pointed to represent the defendant on August 29, 1991.[2] On
February 21, 1992, he filed a motion seeking funds for a psy-
chiatric evaluation of the defendant. The motion was allowed
that same day, and the case was continued to April 21, 1992,
"for trial." One week before the scheduled trial date, counsel
sought a continuance of at least two months. The Common-
wealth opposed the motion on numerous grounds, not the
least of which was the fact that the victims had been receiv-

---

[1]The defendant was also found guilty on two counts of indecent assault
and battery. Because he assented to those convictions being placed on file,
they are not before us. See *Commonwealth* v. *Delgado*, 367 Mass. 432,
438 (1975).

[2]Appellate counsel was not trial counsel.

ing threatening mail and telephone calls. The judge denied the request and the defendant claims error. "[A] motion for continuance . . . lies within the sound discretion of the judge, whose action will not be disturbed unless there is a patent abuse of that discretion, which is to be determined in the circumstances of each case." *Commonwealth* v. *Bettencourt*, 361 Mass. 515, 517-518 (1972). We relate the circumstances of the denial of the defendant's motion.

An affidavit and a letter from a psychiatrist, dated March 17, 1992, were attached to the motion for a continuance. It appears from these documents that the defendant's medical history indicated that he had suffered a series of head injuries from which he might have sustained brain trauma and that, according to the psychiatrist, the "charges now pending against him may reflect behavior caused by those head injuries." As further stated by the psychiatrist: "For a more conclusive answer to the question of the effect of Mr. Shea's head traumas to his alleged criminal acts, it would be necessary for him to undergo independent extensive neuropsychological testing and, in addition, have a BEAM study of the electrical activity of his brain."

As of April 14, 1992, the date of the hearing on the motion for a continuance, the BEAM study had been completed and the results reported to the psychiatrist. A copy of the report which had been submitted to the psychiatrist was also attached to the motion. The report recited the following conclusion of the BEAM study: "Overall this study is quite compatible with a history of multiple head injuries and suggests a generalized encephalopathy with irritable qualities falling just short of being a seizure disorder. The latter diagnosis, of course, should be made on clinical grounds."

It was not until the psychiatrist was called to testify at trial that the defendant's theory of defense took on clarity: on the afternoon of June 15, 1991, he was experiencing a temporal lobe seizure which prevented him from formulating the specific intent necessary for criminal liability for his actions. At the time of the hearing on the motion, however, the trial judge was informed only that a continuance of two

months was necessary so that in addition to the psychiatrist, various other named medical professionals could also review the results of the BEAM study and conduct psychoneurological testing of the defendant. Even were we to conclude that an adequate case for granting the motion had been made at that time, but see *Commonwealth* v. *Bettencourt*, 361 Mass. at 517-518, the defendant has failed to show that his defense was prejudiced by the denial of his request.

Although the defendant argues that the denial of the continuance prevented psychoneurological testing which would have allowed the psychiatrist to opine whether, at the time in question, the defendant was experiencing a temporal lobe seizure, the psychiatrist's testimony does not support the claim. The psychiatrist testified on voir dire that had additional psychoneurological testing been available, he could be more "definitive" or "conclusive" in his opinion concerning the defendant's potential for temporal lobe seizures.[3] The psychiatrist nonetheless could, and did, relate to the jury that it was his opinion, to the requisite degree of medical certainty, that the defendant's "history, test results, and behavior is consistent with a temporal lobe disorder."

As for the more immediate question of whether the defendant was experiencing a seizure at the time of the incident, the psychiatrist testified, on voir dire, that he could not say "with [a] high degree of certainty that at that moment on that boat, that type of episode occurred." Rather, he could state only that "this individual, with his condition, has a high potential for things like that happening." At no time was the psychiatrist asked whether psychoneurological testing could reveal to a reasonable degree of medical certainty whether a person who suffered from temporal lobe disorder

---

[3]The psychiatrist had reviewed some psychoneurological test results which were in the defendant's medical records. When asked by defense counsel whether he could be more conclusive in his opinion had "more extensive psychoneurological testing" been done, the psychiatrist responded ". . . [Y]es, everything that enhances helps become more definitive until ultimately, hopefully, you can become almost conclusive about it. I'm only saying I can't be conclusive, I can only render an opinion at this time."

had in fact experienced a seizure at a specific time in the past.

In sum, the defendant's temporal lobe disorder was fully presented to the jury. Although the defendant's expert and the expert for the Commonwealth agreed that the defendant's BEAM study indicated a temporal lobe abnormality, they sharply disagreed on the issue whether the defendant's actions were consistent or inconsistent with a temporal lobe seizure. However, any weaknesses that the jury might have found in the testimony of the defendant's psychiatrist cannot, on the record before us, be attributed to a lack of psychoneurological testing and the denial of the continuance.

2. *The videotapes.* At trial, the Commonwealth was allowed to use two chalks, i.e., videotapes, to illustrate to the jury the victims' testimony concerning the condition of the ocean when the defendant threw them into the water and abandoned them. The first videotape depicted the victims' view from the water as they watched the defendant drive away, and the second showed how two people in the water would appear from the vantage point of the back of the boat as it drove away from them. The Commonwealth argued that the tapes were relevant to the defendant's murderous intent. After an in camera viewing of the tapes, the trial judge ruled that the videos could be used as chalks. Immediately before the jury viewed the tapes, the trial judge instructed: "This is not offered for your consideration as evidence in this case. It is offered in the nature of what we refer to as a chalk to the extent that it may be of assistance to you in understanding the evidence that you have heard in view of the similarities, if any, and it's for you to determine if there are any similarities in the circumstances of the events of June 15, 1991." See generally Liacos, Massachusetts Evidence § 11.13.2 (6th ed. 1994) ("Chalks are used to illustrate testimony . . . they are not evidence in the ordinary sense of the word").

The defendant complains that the tapes were a prejudicial recreation of the crime, that they were not based upon the evidence, and that they were inflammatory. We see no abuse of discretion or other error in the trial judge's decision to

allow the Commonwealth to use the videotapes as chalks. " 'Whether the conditions were sufficiently similar to make the observation [offered by the demonstration] of any value in aiding the jury to pass upon the issue submitted to them [is] primarily for the trial judge to determine as a matter of discretion. [The judge's] decision in this respect will not be interfered with unless plainly wrong.' " *Commonwealth* v. *Chipman*, 418 Mass. 262, 270-271 (1994), quoting from *Field* v. *Gowdy*, 199 Mass. 568, 574 (1908). See also *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 173 (1983). To the extent the videotapes do not depict anyone being thrown from the boat into the ocean, they are not a recreation of the crime. The tapes otherwise essentially track the victims' testimony.

State police officers Earle S. Sterling and Leonard Coppengrath testified that at 9:30 A.M. on April 15, 1992, they and a number of their associates boarded a boat and proceeded to the point five miles off shore from Boston where the women had been pulled from the water. They described the weather conditions that day as well as the height of the waves and the temperature of the water. They had video cameras and other equipment with them. When they reached their destination, Sterling and another man, who was holding a camera, jumped overboard. Once in the water, the other man held the camera about two inches (the eye level of the victims) above the water, and filmed the boat as it drove off. Meanwhile, Coppengrath, who remained on the boat, focused a camera on the two men in the water as another one of the men slowly drove away.[4] After proceeding about one-half mile, the men in the water were no longer visible from the

---

[4]Although the victims testified that the defendant sped away in the boat, that testimony did not require preclusion of the use of the videotapes, see *Commonwealth* v. *Chipman*, 418 Mass. at 270-271 (1994), especially in light of the trial judge's instructions to the jury prior to the viewing of the films. We also think it inconsequential that there was no evidence to show that the defendant turned to watch the victims as he drove off. The information being illustrated pertained to the water conditions and surroundings, which remained the same irrespective of any particular vantage point, and the defendant's awareness of them.

boat. Coppengrath then panned the "area from where we had come and to where we were heading and circled across the skyline of Boston towards the point in Hull which is the closest point of land to where we were."

There is no persuasive force to the defendant's argument that the Commonwealth's use of the videotapes was no more than a disguised inflammatory appeal to the jurors to put themselves in the place of the victims. See, e.g., *Commonwealth* v. *Sevieri*, 21 Mass. App. Ct. 745, 753-754 (1986). The Commonwealth was entitled to dispel any notion that the defendant's actions were no more than a sunny-day prank gone too far and that he returned for the victims but again departed when he saw them being pulled aboard the sailboat. When the defendant first threw one of the women into the water, she screamed that she did not know how to swim. He then jumped overboard, held her head under the water, and reboarded the boat for the second woman. Before he threw her into the water, she too told him that she could not swim. Having experienced the frigid temperature of the water and the height of the waves and having been told that the victims could not swim, the defendant drove away leaving the women in great peril. The videotapes show what the defendant saw and experienced, and they were relevant to the issue of whether he "did an act designed to result in death with the specific intent that death result." *Commonwealth* v. *Beattie*, 409 Mass. 458, 459 (1991). See also *Commonwealth* v. *Hebert*, 373 Mass. 535, 537 (1977) ("An attempt to commit a crime necessarily involves an intent to commit that crime").[5] We have viewed the videotapes and conclude that the trial judge neither abused his discretion nor committed other error of law in allowing them to be seen by the jury. See *Commonwealth* v. *Chipman*, 418 Mass. at 271; *Terrio* v. *McDonough*, 16 Mass. App. Ct. at 173.

---

[5]As the videotapes were illustrative on the issue of the defendant's intent, we need not consider whether, as the Commonwealth argues, they were also helpful to an understanding of the victims' state of mind, an issue of questionable relevancy. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 282-283 (1990).

3. *Attempted murder and kidnapping.* It is the defendant's argument that the Commonwealth failed to prove that when he threw the women into the water and drove away, he specifically intended their death. Taking the evidence in the light most favorable to the Commonwealth, we see no error in the trial judge's denial of the defendant's motion for a required finding of not guilty on the indictments charging him with attempted murder by drowning. There was evidence to show that the defendant was five miles off-shore with no boats in sight when he threw the women overboard. The water was fifty-two degrees, and the waves were one to two feet high. Because the defendant had jumped into the water to hold one of the woman under, he knew that it was cold and choppy. For all he knew, they could not swim.

This evidence of the defendant's conduct was sufficient to warrant the reasonable inference that he intended that the victims drown. See *Commonwealth* v. *Henson,* 394 Mass. 584, 591 (1985) ("[A]n intent to kill may be inferred from the defendant's conduct"); *Commonwealth* v. *Dixon,* 34 Mass. App. Ct. 653, 656 (1993) (attempted murder statute reaches act of throwing someone who cannot swim from a boat into water).[6]

In arguing that there was no evidence of kidnappings apart from the conduct incidental to the attempted murders, i.e., picking the women up and throwing them into the water, the defendant ignores the testimony of the victims. Both women related that after the defendant disrobed and made sexual advances towards them, they demanded that he return them to shore. He refused, continued with his offensive behavior, became angry over their reaction, and then threw them overboard. Moreover, the conduct which the jury reasonably could find as the basis for the kidnapping, forcing the women

---

[6]In deciding this issue, we need not, contrary to the defendant's argument, consider the testimony of his friend, that he was "eventually" able to persuade the defendant to turn back for the women and that with the aid of binoculars they were able to see the women about three-quarters of a mile away being pulled aboard a sailboat. See *Commonwealth* v. *Lydon,* 413 Mass. 309, 312 (1992).

to remain at sea while the defendant committed an indecent assault and battery upon them (see note one, *supra*), would not necessarily be based on the acts that constituted the attempted murders. See *Commonwealth* v. *Rivera*, 397 Mass. 244, 253-254 (1986); *Commonwealth* v. *Sumner*, 18 Mass. App. Ct. 349, 352-353 (1984).

4. *The dangerous weapon.* General Laws c. 265, § 15A, reads, in pertinent part: "Whoever commits assault and battery upon another by means of a dangerous weapon shall be punished . . . ." The sole argument made by the defendant in respect to the indictments charging him with assault and battery by means of a dangerous weapon is that the ocean is not a dangerous weapon within the meaning of § 15A.

We need not consider whether the specified weapon, the ocean, is dangerous per se or dangerous as used. See *Commonwealth* v. *Tarrant*, 367 Mass. 411, 416-417 (1975); *Commonwealth* v. *Appleby*, 380 Mass. 296, 303 (1980). Although the ocean can be and often is dangerous, it cannot be regarded in its natural state as a weapon within the meaning of § 15A. See *Commonwealth* v. *Farrell*, 322 Mass. 606, 614-615 (1948), stating that the term "dangerous weapon" comprehends "any *instrument or instrumentality* so constructed or so used as to be likely to produce death or great bodily harm" (emphasis added); *Commonwealth* v. *Tarrant*, 367 Mass. at 417 n.6, noting with approval the definition of dangerous weapon adopted in the Proposed Criminal Code of Massachusetts c. 263, § 3(i): " 'any firearm or other weapon, device, instrument, material or substance, *whether animate or inanimate*, which in the manner [in] which it is used *or is intended to be used* is capable of producing death or serious bodily injury' (emphasis added)"[7]; *Commonwealth* v. *Appleby*, 380 Mass. at 308, concluding that the "offense of as-

[7]This definition tracks that of "deadly weapon" set out in § 210 of the Model Penal Code (1980), which, as noted in comment 5, was "designed to take account of the ingenuity of those who desire to hurt their fellows without encompassing every use of an ordinary object that could cause death or serious injury."

sault and battery by means of a dangerous weapon under G. L. c. 265, § 15A, requires that the elements of assault be present . . . that there be a touching, however slight . . . that the touching be by means of the weapon . . . and that the battery be accomplished by use of an inherently dangerous weapon, or by use of *some other object* as a weapon, with the intent to *use that object* in a dangerous or potentially dangerous fashion" (emphasis added).

All the cases collected and cited in the discussion of dangerous weapons, per se and as used, in *Commonwealth* v. *Appleby*, 380 Mass. at 303-304, share a common fact that is consistent with the definitions of "dangerous weapons" which speak in terms of "objects" or "instrumentalities." The commonality found in those cases is that the object in issue, whether dangerous per se or as used, was an instrumentality which the batterer controlled, either through possession of or authority over it, for use of it in the intentional application of force. Because the ocean in its natural state cannot be possessed or controlled, it is not an object or instrumentality capable of use as a weapon for purposes of § 15A.

Our conclusion should not be construed to mean that there can never be criminal liability for causing physical harm to someone by subjecting them to a force of nature. We conclude only that for purposes of § 15A, the ocean, not being subject to human control, was not, in the instant case, an object or instrumentality which could be found by the jury to be a dangerous weapon. Accordingly, the defendant's motion for required findings of not guilty on the indictments charging him with assault and battery by means of a dangerous weapon should have been allowed.

5. *Conclusion.* It follows from what we have said that the judgments entered on the indictments charging kidnapping and attempted murder are affirmed. The judgments entered on the indictments charging assault and battery by means of a dangerous weapon are reversed, the verdicts are set aside,

and judgments for the defendant are to enter on those indictments.[8]

*So ordered.*

---

[8]The Commonwealth has not argued that the defendant should, in any event, be resentenced on the lesser offense of assault and battery, presumably for the reason, if no other, that it would make no practical difference. The sentence imposed on the conviction for assault and battery by means of a dangerous weapon was to be served concurrently with that imposed on the attempted murder conviction.