Commonwealth *v.* Sexton.

COMMONWEALTH *vs.* EVERETT SEXTON.

Hampden. April 9, 1997. - June 5, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Assault and Battery by Means of a Dangerous Weapon. Joint Enterprise. Statute, Construction. Words, "Dangerous weapon."*

"Concrete pavement" constitutes a dangerous weapon for purposes of a prosecution under G. L. c. 265, § 15A, and one who intentionally uses concrete pavement as a means of inflicting serious harm can be found guilty of assault and battery by means of a dangerous weapon. [149-152]

Evidence at the trial of an indictment for assault and battery by means of a dangerous weapon was sufficient to warrant the defendant's conviction on a joint venture theory. [152]

INDICTMENTS found and returned in the Superior Court Department on March 30, 1993.

The cases were tried before *John F. Moriarty*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Marcia B. Julian*, Assistant District Attorney, for the Commonwealth.

*Timothy M. Farris* for the defendant.

FRIED, J. The defendant, Everett Sexton, was convicted on a joint venture theory of assault and battery by means of a dangerous weapon and wilful and malicious destruction of property. On appeal, the Appeals Court affirmed his conviction of wilful and malicious destruction of property, but reversed his conviction of assault and battery by means of a dangerous weapon on the ground that concrete pavement, the instrumentality at issue, is not a dangerous weapon. *Commonwealth* v. *Sexton*, 41 Mass. App. Ct. 676, 678-680 (1996). We granted the Commonwealth's application for further appellate review and affirm the conviction by the Superior Court.

I

On the evening of August 28, 1992, Jeffrey Czyzewski and

a female companion went to a bar in Holyoke. At the bar, Czyzewski played a game of pool with the wife of Donald Sexton. Czyzewski briefly left the pool table. On his return, he accused Sexton's wife of cheating by moving the pool balls during his absence. Ending the game, Czyzewski left the pool table and was thereafter approached three separate times by an agitated Donald Sexton, who demanded an apology. Czyzewski testified that after the second request, the defendant, Everett Sexton, the brother of Donald Sexton, approached Czyzewski and said that he would stand by his brother if anything happened. On the third occasion, Donald Sexton smashed a beer bottle on the bar, but was restrained before he could threaten Czyzewski further. Following this incident, the defendant, his brother, and his brother's wife left the bar.

Shortly thereafter, Czyzewski and his companion went out to the parking lot and got into their car. Immediately a van pulled up alongside them and the defendant, his brother, and a third man got out. The defendant and his brother kicked in the window on the passenger side where Czyzewski was sitting. The defendant reached through the shattered window to grab Czyzewski, attempting to pull him through the window. At that moment, Czyzewski's companion was able to start the car and drove out of the parking lot. As they pulled out, the Sextons said, "Let's go get him," and returned to the van to follow Czyzewski. Because their car was about to run out of gas, Czyzewski and his companion were forced to return to the parking lot, with the van following behind. Czyzewski left the vehicle and Donald Sexton, the defendant, and their companion left their van. The defendant and his brother immediately approached Czyzewski; they began to push and shove him. The defendant restrained Czyzewski by lifting Czyzewski's jacket over his head and the brothers threw Czyzewski to the ground. On the ground, Donald Sexton banged Czyzewski's head against the pavement a number of times while the defendant repeatedly kicked him. The beating was interrupted by the bar owner and another man. The Sexton brothers left before the police arrived.

## II

The Appeals Court held that the defendant possessed the requisite intent and knowledge to be guilty of assault and bat-

tery by means of a dangerous weapon on a joint venture theory, but reversed this conviction on the ground that "concrete pavement" is not a dangerous weapon under G. L. c. 256, § 15A. *Commonwealth* v. *Sexton, supra* at 678-679. At trial, the judge had instructed the jury that "concrete pavement" could be considered a dangerous weapon if the jury found that it was "used in such a way that [it was] capable of causing death or serious[] bodily injury to a person." While the Appeals Court agreed that "ordinarily the determination whether an object that is not dangerous per se is a dangerous weapon under § 15A is a question of fact for the jury," *Commonwealth* v. *Sexton*, 41 Mass. App. Ct. 676, 679 (1996), citing *Commonwealth* v. *Appleby*, 380 Mass. 296, 305 (1980), and *Commonwealth* v. *Marrero*, 19 Mass. App. Ct. 921, 922 (1984), concrete pavement did not fit the statutory definition and thus "[did] not qualify as a dangerous weapon[] under § 15A as a matter of law." *Commonwealth* v. *Sexton, supra* at 679, citing *Commonwealth* v. *Shea*, 38 Mass. App. Ct. 7, 15 (1995) (ocean), and *Commonwealth* v. *Davis*, 10 Mass. App. Ct. 190, 193 (1980) (human teeth). The Appeals Court reached this holding by reading *Commonwealth* v. *Shea, supra,* to conclude that a dangerous weapon "is an object or instrumentality that the batterer is able to wield to inflict serious injury or death upon another." *Commonwealth* v. *Sexton, supra.* Because the pavement was not an item with which the defendant "could arm himself," but was instead "simply part of the surroundings in which the defendant found himself while perpetrating an assault," *id.,* the Appeals Court rejected the Commonwealth's argument that, in the circumstances, the pavement met the statutory requirements because it was "used . . . in a manner that was capable of producing serious bodily harm."

The Appeals Court also supported its decision by noting that "it is a well settled principle of statutory construction that criminal statutes are to be strictly construed." *Commonwealth* v. *Sexton, supra* at 679, citing *Commonwealth* v. *Campbell*, 415 Mass. 697, 699 (1993). In construing G. L. c. 265, § 15A, we note that the phrase "dangerous weapon" is not defined. Instead, we have consistently looked to our precedent in applying this label. We find nothing in our case law which precludes our holding today, see *Commonwealth* v. *Statham*, 38 Mass. App. Ct. 582, 584 (1995) (case law interpreta- tion controls in absence of statutory definition), nor do

we think it contravenes the intent of the Legislature, which chose to invoke greater penalties for assaults which threatened serious injury because an actor chose to employ a dangerous weapon.

This case presents an issue of first impression, in that we have not previously addressed whether stationary objects can be considered dangerous weapons in Massachusetts. The statute, G. L. c. 265, § 15A, does not define the term "dangerous weapon," but we have stated previously that there are things which are dangerous per se and those which are dangerous as used. *Commonwealth* v. *Appleby*, 380 Mass. 296, 303 (1980). We have defined the former class as "instrumentalit[ies] designed and constructed to produce death or great bodily harm." *Id.* In the latter class are things which become dangerous weapons because they are "used in a dangerous fashion." *Id.* at 304. In such cases it is generally "a question for the fact finder whether the instrument was so used in a particular case." *Id. Commonwealth* v. *Farrell*, 322 Mass. 606, 614-615 (1948). See *Commonwealth* v. *Davis, supra* at 193 (fact finder looks to the "circumstances surrounding the crime [including], the nature, size and shape of the object, and the manner in which it is handled or controlled"). In evaluating different situations, the determination has invariably turned on "use," and our courts have repeatedly held that ordinarily innocuous items can be considered dangerous weapons when used in an improper and dangerous manner. See *Commonwealth* v. *Scott*, 408 Mass. 811, 822-823 (1990) (gag); *Commonwealth* v. *Barrett*, 386 Mass. 649, 655-656 (1982) (aerosol spray can); *Commonwealth* v. *Appleby, supra* at 304-305 (riding crop); *Commonwealth* v. *Tarrant*, 367 Mass. 411, 418 (1975) (German shepherd dog); *Commonwealth* v. *Farrell, supra* at 615 (lighted cigarettes); *Commonwealth* v. *Mercado*, 24 Mass. App. Ct. 391, 395 (1987) (baseball bat); Commonwealth v. *LeBlanc*, 3 Mass. App. Ct. 780, 780 (1975) (automobile door swung knocking police officer down). Our courts have also noted, with approval, decisions in other jurisdictions which have found otherwise innocent items to fit this classification when used in a way which endangers another's safety. *Commonwealth* v. *Appleby, supra* at 304. *Commonwealth* v. *Davis, supra* at 192-193. See *United States* v. *Loman*, 551 F.2d 164, 169 (7th Cir.), cert. denied, 433 U.S. 912 (1977) (walking stick); *United States* v. *Johnson*, 324 F.2d 264, 266 (4th Cir.

1963) (chair brought down upon victim's head); *People* v. *White*, 212 Cal. App. 2d 464, 465 (1963) (a rock); *Bennett* v. *State*, 237 Md. 212, 216 (1964) (microphone cord wrapped around victim's neck); *People* v. *Buford*, 69 Mich. App. 27, 30 (1976) (dictum) (automobile, broomstick, flashlight and lighter fluid may all be dangerous weapons as used).

We do not agree with the Appeals Court that, to be a dangerous weapon, the defendant must be able to wield the item at issue, nor do we think it relevant that the pavement was present as part of the environment in which the defendant chose to participate in this assault. Prior to the Appeals Court's decision in *Commonwealth* v. *Shea, supra,* the only explicit restriction on our use-based categorization of dangerous weapons held that human teeth and other parts of the human body were not dangerous weapons because they are not "instrumentalities apart from the defendant's person." *Commonwealth* v. *Davis, supra* at 193. In *Shea,* a case in which the defendant pushed two women from his boat and sped off, leaving them five miles off shore, the Appeals Court found that, while "the ocean can be and often is dangerous, it cannot be regarded in its natural state as a weapon within the meaning of § 15A," because "in its natural state [it] cannot be possessed or controlled." *Commonwealth* v. *Shea, supra* at 15-16. We believe that this is too narrow a reading of the instrumentality and use language we have employed when we have defined dangerous weapons as "an instrument or instrumentality which, because of the manner in which it is used, or attempted to be used, endangers the life or inflicts great bodily harm." *Commonwealth* v. *Farrell, supra* at 615. While one might not be able to possess the ocean or exercise authority over it in a traditional sense, *Commonwealth* v. *Shea, supra* at 16, one could certainly use it to inflict great harm, such as by holding another's head underwater.[1]

Likewise, it is obvious that one could employ concrete pavement, as the defendant and his brother did here, to cause

---

[1]While we take issue with some of the reasoning in *Shea,* we do not necessarily disagree with the result the court reached in that case. In *Shea,* the danger posed by the ocean was not a result of the defendant bringing his victims into contact with that body of water, but rather the circumstances which followed when he deserted them, five miles from shore. We contrast this to a situation in which a defendant might drop his victim into a vat of acid, in which the mere contact with the substance would directly pose the risk of serious bodily harm.

serious bodily harm to another by banging the victim's head against the hard surface. As the Commonwealth points out, there would be no problem in convicting a defendant of assault and battery by means of a dangerous weapon if he used a broken slab of concrete to bludgeon his victim. We see no reason to hold that such a conviction cannot stand merely because the instrumentality in question is a fixed thing at the time of its dangerous use.

A number of other jurisdictions which have considered this question have also held that an object's stationary character does not prevent its use as a dangerous weapon. *United States* v. *Murphy*, 35 F.3d 143, 147 (4th Cir. 1994), cert. denied, 513 U.S. 1135 (1995) (steel cell bars); *State* v. *Brinson*, 337 N.C. 764, 766 (1994) (cell bars and floor); *People* v. *O'Hagan*, 176 A.D.2d 179, 179 (N.Y. 1991) (cell bars); *People* v. *Coe*, 165 A.D.2d 721, 722 (N.Y. 1990) (plate glass window); *State* v. *Reed*, 101 Or. App. 277, 279-280 (1990) (sidewalk); *People* v. *Galvin*, 65 N.Y.2d 761, 762-763 (1985) (same).[2] As North Carolina recognized, an item's dangerous propensities "often depend[] entirely on its use," *State* v. *Brinson*, *supra* at 769, and not its mobility, for "[w]hether the pitcher hits the stone or the stone hits the pitcher, it will be bad for the pitcher." *State* v. *Reed*, *supra* at 280, quoting Cervantes, Don Quixote,

_____

[2] While other jurisdictions have taken a contrary position, we do not find them sufficiently apposite. In *Edwards* v. *United States*, 583 A.2d 661, 663-664 (D.C. 1990), in determining whether bathroom fixtures could be considered dangerous weapons, the court was applying a statute which addressed crimes committed by a person "armed with or having readily available any pistol or other firearm . . . or other dangerous or deadly weapon," which went on to enumerate the types of specific instrumentalities the statute contemplated, carrying with its violation a possible life sentence. Although the Supreme Court of Louisiana rejected concrete as a dangerous weapon, it did so in the context of a defendant striking his victim and "caus[ing] him to fall upon the concrete and sustain injuries," *State* v. *Legendre*, 362 So. 2d 570, 571 (La. 1978), a scenario quite different from the purposeful and deliberate use of the pavement as a means of beating another which we must examine. Likewise, a Missouri appellate court found it "untenable to suggest that the dangerous instrument or deadly weapon components" of its statute were implicated in a case where the defendant beat a woman against a door casing and plumbing fixtures, but only considered whether the defendant's fists met this definition, never addressing the defendant's use of stationary objects he employed. *State* v. *Johnson*, 770 S.W.2d 263, 269 (Mo. Ct. App. 1989). Only *State* v. *Houck*, 652 So. 2d 359, 360 (Fla. 1995) (pavement and other passive objects not considered weapons as matter of law), directly contradicts our holding.

Part II, ch. 43 (1615). We hold that one who intentionally uses concrete pavement as a means of inflicting serious harm can be found guilty of assault and battery by means of a dangerous weapon.

Finally, we agree with the Appeals Court that the jury were presented with sufficient evidence to find that the defendant possessed the requisite intent and knowledge to be guilty of assault and battery by means of a dangerous weapon under a joint venture theory. From the defendant's statements and actions it is apparent that he possessed the intent to engage in an assault and battery with his brother. While he may not initially have had knowledge that his brother intended to use the pavement to effectuate the attack, as the Appeals Court noted, "there is no need to prove an anticipatory compact between the parties to establish joint venture," *Commonwealth* v. *Sexton, supra* at 678, citing *Commonwealth* v. *Fidler*, 23 Mass. App. Ct. 506, 513 (1987), if, "at the climactic moment the parties consciously acted together in carrying out the criminal endeavor." *Commonwealth* v. *Young*, 35 Mass. App. Ct. 427, 435 (1993). The defendant continuously kicked and punched Czyzewski while his brother repeatedly slammed Czyzewski's head into the pavement. At no time during this conflict did the defendant seek to withdraw.

The conviction of assault and battery by means of a dangerous weapon is affirmed.

*So ordered.*