COMMONWEALTH *vs.* ROBERT NICKERSON.

No. 10-P-486.

Norfolk. April 6, 2011. - June 8, 2011.

Present: McHugh, Brown, & Grainger, JJ.

*Receiving Stolen Goods. Threshold Police Inquiry. Search and Seizure,* Threshold police inquiry, Reasonable suspicion, Protective frisk, Consent. *Constitutional Law,* Reasonable suspicion. *Protective Custody. Error, Harmless.*

A police officer encountering the defendant well after midnight in a high-crime area not long after a reported burglary was warranted in making a threshold inquiry of the defendant, where the defendant, who was the only discernible individual in the vicinity at the time, emerged from a side yard (i.e., private property), sought to evade the officer by altering his path of travel, and was in possession of a flashlight, which he attempted to conceal. [645-646] Brown, J., concurring.

At the trial of an indictment charging receiving stolen property over $250, in violation of G. L. c. 266, § 60, the Commonwealth satisfied its burden of demonstrating that the police officers' search of the defendant and the defendant's accompanying consent were obtained by means sufficiently distinguishable from an allegedly illegal initial patfrisk to be purged of the primary taint [646-648]; however, although the officers unlawfully detained the defendant under G. L. c. 111B, § 8, the protective custody statute, evidence flowing from the officers' continuing investigation — and trial testimony summarizing their efforts — was not obtained by exploiting the prior illegality but rather from evidence lawfully seized during the search [648-649], and the record established beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained [649-651]. Brown, J., concurring.

INDICTMENT found and returned in the Superior Court Department on November 17, 2006.

A pretrial motion to suppress evidence was heard by *Barbara A. Dortch-Okara,* J., and case was tried before *Wendie I. Gershengorn,* J.

*John M. Goggins* for the defendant.

*Kevin J. Powers,* Assistant District Attorney, for the Commonwealth.

GRAINGER, J. Following a jury trial in Superior Court the defendant was convicted of one count of receiving stolen property over $250, G. L. c. 266, § 60.[1] On appeal, he raises numerous claims of error, including the denial of his pretrial motion to suppress.[2] Because we conclude that the investigating officers' initial search and ultimate detention of the defendant were not supported by reasonable suspicion, but that the admission of the resulting fruits at trial was harmless beyond a reasonable doubt, we affirm the judgment of conviction.

*Background.* We summarize the relevant facts from the motion judge's findings, supplemented as necessary with uncontested facts from the motion hearings. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007). Shortly after midnight on July 26, 2006, Officer Paul Holland of the Quincy police department responded to a report of a robbery at 75 Roberts Street. The victim, Mary O'Toole, informed Officer Holland that her purse, containing a cellular telephone (cell phone) and other items of value, had been stolen. Officer Holland relayed this information to other officers, noting that the perpetrator appeared to have entered the home through a rear window using a lawn chair.

Among those receiving the dispatch was Sergeant John P. Kelly, who immediately recalled several recent burglaries in the area perpetrated with a similar modus operandi. At approximately 1:25 A.M., Sergeant Kelly stationed himself approximately one-quarter mile from the scene of the crime[3] and, within ten minutes, observed the defendant emerge from a side yard carrying a flashlight and a partially consumed twelve-pack of beer.[4] Upon spotting Sergeant Kelly, who was in full uni-

[1]The jury acquitted the defendant of the following charges: unarmed burglary, G. L. c. 266, § 15; larceny over $250, G. L. c. 266, § 30; receiving stolen property under $250, G. L. c. 266, § 60; and larceny under $250, G. L. c. 266, § 30.

[2]The defendant also alleges that the trial judge created a substantial risk of a miscarriage of justice by failing to properly instruct the jury on the definition of reasonable doubt.

[3]Sergeant Kelly testified that he considered Roberts Street and the surrounding neighborhood to be a high-crime area.

[4]Further inspection revealed that eight of the twelve beers remained unopened in the container.

form, the defendant began walking quickly in the opposite direction while simultaneously attempting to conceal the flashlight.

Sergeant Kelly approached the defendant and told him to stop. The sergeant observed the defendant to be nervous, with glassy, bloodshot eyes, and he detected an odor of alcohol on the defendant's breath. The defendant informed Sergeant Kelly that he was "just walking and drinking," at which point Sergeant Kelly performed a patfrisk for his safety. The frisk revealed a Verizon LG digital cell phone, which Sergeant Kelly removed, a large amount of change, and a partially consumed pint of vodka.

Sergeant Kelly resumed his questioning of the defendant, inquiring where he resided. The defendant responded that he lived with his girlfriend at 4 Bridge Street, a location several miles away.[5] Upon request the defendant identified himself as Robert Nickerson, a name Sergeant Kelly immediately recognized as belonging to an individual implicated in and convicted of several past burglaries in Quincy. Sergeant Kelly thereupon radioed for backup and provided the defendant with Miranda warnings, though he did not formally arrest the defendant.

Within minutes, Officer Dennis Keenan arrived at the scene. The defendant indicated that he needed to call his girlfriend, at which point Sergeant Kelly inquired about ownership of the confiscated cell phone. Though initially professing his ignorance, when asked a second time the defendant responded that the cell phone belonged to a close friend — though he was unable to provide a name. When Sergeant Kelly asked if the defendant had anything else on his person, he responded, "[N]o, go ahead, search me." A second search performed by Officer Keenan uncovered a woman's gold "X & O" bracelet and gold chain. The defendant maintained that the jewelry belonged to his girlfriend and that he was merely holding the items for safekeeping. Contemporaneously, Sergeant Kelly performed a search of the defendant's wallet and uncovered documentation, specifically a receipt, in the name of Maureen Cloonan, who resided at 45 Bridge Street.

[5]Sergeant Kelly also testified that at the time of the stop he was aware of several burglaries committed on Bridge Street. The houses were burglarized in a similar fashion to O'Toole's residence, with the perpetrator using a chair to enter the residence through a rear window after dark.

Suspecting that the defendant was incapacitated, Sergeant Kelly determined that he should be taken into protective custody. The officers handcuffed the defendant and transported him to the Quincy police station. One of the officers eventually spoke with the defendant's girlfriend by telephone. She confirmed that the jewelry did not belong to her and indicated that the defendant did not have any alcohol, or sufficient funds to purchase the same, on his person when she dropped him off in the vicinity of Roberts Street earlier in the evening. Subsequent investigation at the police station revealed that the cell phone, gold bracelet, and gold chain were reported stolen, and that the residence at the address listed on the receipt seized from the defendant had been recently burglarized.

*Discussion.* The defendant challenges Sergeant Kelly's initial threshold inquiry, the initial patfrisk, the validity of the defendant's ensuing consent to the additional search performed by Officer Keenan, and the defendant's eventual detention pursuant to G. L. c. 111B, § 8. He maintains that the unlawful nature of these actions requires suppression of all evidence flowing from the violations as fruit of the poisonous tree. We address each contention in turn. When reviewing a motion to suppress, we accept the motion judge's subsidiary findings of fact absent clear error. *Commonwealth* v. *Isaiah I.,* 450 Mass. 818, 821 (2008). "Our review of the application of constitutional principles to those facts, however, is plenary." *Commonwealth* v. *Watts,* 74 Mass. App. Ct. 514, 516-517 (2009), quoting from *Commonwealth* v. *Kaupp,* 453 Mass. 102, 105 (2009).

a. *Threshold inquiry.* "[A] police officer may stop an individual and conduct a threshold inquiry if the officer reasonably suspects that such individual has committed, is committing, or is about to commit a crime." *Commonwealth* v. *Mercado,* 422 Mass. 367, 369 (1996). The officer's suspicion must be based on specific, articulable facts and reasonable inferences drawn from them. *Ibid.*

The circumstances surrounding Sergeant Kelly's initial detention of the defendant support a finding of reasonable suspicion for the stop. In assessing the reasonableness of an officer's acts our function is not to probe each fact and inference underlying his suspicion individually, but rather collectively, "as a whole."

*Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981). To this end, "[s]eemingly innocent activities taken together can give rise to reasonable suspicion justifying a threshold inquiry." *Commonwealth* v. *Watson*, 430 Mass. 725, 729 (2000). Here, Sergeant Kelly encountered the defendant well after midnight in a high-crime area not long after a reported burglary. The defendant, who was the only discernible individual in the vicinity at the time, emerged from a side yard, that is, from private property. He then sought to evade Sergeant Kelly by altering his path of travel. Finally, the defendant was in possession of what a fact finder could consider a burglarious tool, a flashlight, which he attempted to conceal as Sergeant Kelly approached.[6] We conclude that Sergeant Kelly's initial stop of the defendant was warranted.

b. *Protective patfrisk.* The defendant challenges the justification for the patfrisk, which occurred promptly after he was stopped. As stated above, the patfrisk yielded a Verizon LG digital cell phone, a large amount of change, and a partially consumed pint of vodka. None of these items was evidence relevant to, or supported, the defendant's conviction. We therefore need not address the judge's determination that the search was justified or her decision not to suppress these items.

c. *Consent search.* We now address the voluntariness of the defendant's consent to a second search conducted by Officer Keenan within minutes of the initial search. We consider this issue with the assumption stated by the defendant, utilized here purely for purposes of analysis, that the patfrisk preceding the consent search was unjustified.

"When consent to search is obtained through exploitation of a prior illegality, particularly very close in time following the prior illegality, the consent has not been regarded as freely given." *Commonwealth* v. *Midi*, 46 Mass. App. Ct. 591, 595 (1999). The defendant argues, as in *Midi*, that the fruits of the initial search were unlawful, and that these fruits prompted the

---

[6]The defendant's argument that Sergeant Kelly's initial approach constituted a seizure is unavailing. The direction to stop was delivered only after the indicia recited above had been observed. "The officer's approach without any direction to stop . . . did not constitute a seizure." *Commonwealth* v. *Gunther G.*, 45 Mass. App. Ct. 116, 117 (1998).

officers' request to search him a second time. The Commonwealth bears the burden of proving otherwise. *Ibid.*

However, the record provides no basis to conclude that the defendant was under coercion when he consented to the second search, and he makes no such claim.[7] He argues on appeal that there was no attenuation that would remove the taint created by the illegal stop. Since we conclude that the stop was justified, the only remaining question posed by the defendant's assertion is whether the officers' request to search was a direct result of the preceding patfrisk. Evidence obtained in the aftermath of an unlawful seizure does not "automatically become 'sacred and inaccessible.' " *Commonwealth* v. *Frodyma*, 393 Mass. 438, 441 (1984), quoting from *Nix* v. *Williams*, 467 U.S. 431, 441 (1984). Rather, the "apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Ibid.*, quoting from *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963). If knowledge of the facts justifying subsequent conduct "is gained from an *independent source*, [it] may be proved like any others . . . ." *Nix* v. *Williams*, *supra* at 441, quoting from *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392 (1920).

As stated, the initial detention was supported by reasonable suspicion that the defendant had burgled the O'Toole residence. Following the patfrisk, which occurred mere seconds after the initial stop, Sergeant Kelly continued the thread of his previous questioning of the defendant. The questions were fairly innocuous[8] and their correlation to the evidence uncovered during the patfrisk tenuous at best. The defendant's answers to these basic questions heightened Sergeant Kelly's suspicion and prompted him to radio for backup.[9] Only after Officer Keenan arrived on the scene, and after the defendant, without prompting, indicated

---

[7]Indicative of his perception that he was not being coerced, the defendant refused to identify the "friend" whose cell phone he was carrying, stating, "It's none of your business, I don't have to talk."

[8]As noted *supra*, Sergeant Kelly asked the defendant where he resided and requested that the defendant identify himself.

[9]This series of events — the initial detention, patfrisk, and subsequent questioning — unfolded in a matter of minutes, and the defendant's detention

that he needed to call his girlfriend, did Sergeant Kelly inquire as to ownership of the cell phone.

With his suspicions aroused as a result of the defendant's responses to further questioning, Sergeant Kelly asked the defendant to consent to a search for contraband on his person. The officer's request to search was the product of heightened suspicion created by the information he had received after he resumed questioning: (1) the identity of the defendant as an individual previously arraigned and, on multiple occasions, convicted in conjunction with several prior burglaries, and (2) the defendant's residence in the vicinity of numerous similar burglaries. In these circumstances, we conclude that the Commonwealth satisfied its burden to demonstrate that the search and accompanying consent were obtained "by means sufficiently distinguishable [from the allegedly illegal patfrisk] to be purged of the primary taint." *Commonwealth* v. *Frodyma, supra* at 441, quoting from *Wong Sun* v. *United States*, 371 U.S. at 488. Accordingly, evidence flowing from that search — including the gold X & O bracelet and gold chain forming the basis for the receiving stolen property charge — was in any case properly admitted.

d. *Protective custody.* Police may take an individual into protective custody if they possess reasonable suspicion that the person is "incapacitated." G. L. c. 111B, § 8. See *Commonwealth* v. *McCaffrey*, 49 Mass. App. Ct. 713, 716 (2000), citing G. L. c. 111B, § 8. " 'Incapacitated' is defined as 'the condition of an intoxicated person who, by reason of the consumption of intoxicating liquor is (1) unconscious, (2) in need of medical attention, (3) likely to suffer or cause physical harm or damage property, or (4) disorderly.' " *Ibid.*, quoting from G. L. c. 111B, § 3.

The record does not reflect a sufficient basis to conclude that the defendant was incapacitated within the meaning of G. L.

---

was reasonable and proportional given the sergeant's initial suspicions. See *Commonwealth* v. *Moses*, 408 Mass. 136, 141 (1990) (detention during investigatory stop does not automatically become an arrest simply because defendant is not free to leave); *Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. 554, 557 (1996) ("justifiable threshold inquiry permits limited restraint of the individuals involved as long as their detention is commensurate with the purpose of the stop").

c. 111B, § 8. The evidence of intoxication was the defendant's bloodshot, glassy eyes and a moderate odor of alcohol, and the defendant's ready admission that he had consumed alcohol. However, the defendant was not actively consuming alcohol when first observed by Sergeant Kelly, and nothing in the record suggests the quantity consumed. His consumption did not appear to impede his ability to converse coherently, or relate appropriately, with the police, and at no time was any officer motivated to administer field sobriety tests. Contrast *Commonwealth* v. *Tomeo*, 400 Mass. 23, 24-25 (1987) (officer had reason to believe that intoxicated defendant, attempting to drive away in his car, would pose a risk to himself or others); *Commonwealth* v. *McCaffrey*, *supra* at 716-717 (officer's observation of defendant walking, apparently intoxicated, in the middle of the road supported reasonable belief that defendant was likely to suffer physical harm). Accordingly, the defendant's detention pursuant to G. L. c. 111B, § 8, constituted an unlawful seizure in violation of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.

Evidence obtained by exploiting unlawful police conduct must be suppressed. See *Brown* v. *Illinois*, 422 U.S. 590 (1975); *Commonwealth* v. *Bottari*, 395 Mass. 777, 784-785 (1985). We recognize that the defendant's unlawful detention facilitated the officers' continued investigation, and thus, in a sense, the defendant's presence at trial was a direct result of the seizure. But "the defendant 'is not himself a suppressible "fruit," and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct.' " *Commonwealth* v. *Greenwood*, 78 Mass. App. Ct. 611, 622 (2011), quoting from *United States* v. *Crews*, 445 U.S. 463, 474 (1980). Moreover, evidence flowing from the officers' continuing investigation — and trial testimony summarizing their efforts — was not obtained by exploiting the prior illegality. The ensuing investigation stemmed not from the unlawful detention but rather from evidence lawfully seized during Officer Keenan's search of the defendant, to which he consented.

e. *Harmless error.* Having concluded that the protective

custody was unjustified, we must now determine whether it led to the erroneous admission of evidence that was "harmless beyond a reasonable doubt." *Commonwealth* v. *Tyree*, 455 Mass. 676, 700 (2010), quoting from *Chapman* v. *California*, 386 U.S. 18, 24 (1967), and cases cited. When undertaking this analysis, the essential question is "whether the record establishes 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Commonwealth* v. *Peixoto*, 430 Mass. 654, 660 (2000), quoting from *Chapman* v. *California*, *supra*. "The inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error." *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445-446 (1983), quoting from *Kotteakos* v. *United States*, 328 U.S. 750, 765 (1946). "[I]t is not enough for the Commonwealth to demonstrate that its other, properly admitted evidence was 'sufficient' to convict the defendant or that the inadmissible evidence was 'consistent' with the admissible evidence." *Commonwealth* v. *Tyree*, *supra* at 701, quoting from *Commonwealth* v. *Dagraca*, 447 Mass. 546, 554-555 (2006).

Our review of the record confirms that the Commonwealth's case with regard to the receiving stolen property charge can be characterized as extremely strong. In order to be convicted of receiving stolen property, "(1) one must buy, receive or aid in the concealment of property which has been stolen or embezzled, (2) knowing it to have been stolen." *Commonwealth* v. *Cromwell*, 53 Mass. App. Ct. 662, 664 (2002), quoting from *Commonwealth* v. *Yourawski*, 384 Mass. 386, 387 (1981). G. L. c. 266, § 60. Officer Keenan testified to retrieving two pieces of jewelry — a gold X & O bracelet and a gold chain — from the defendant's person. The defendant's explanation for his possession of the jewelry was not consistent with his having unknowingly received the items from a third party or simply found them; rather, he stated that the items belonged to his girlfriend. This explanation was belied by the testimony of Monica Coletta, who reported her purse — containing, among other things, a gold X & O bracelet and a gold chain belonging to her daughter — stolen on the morning of July 26, 2006.[10]

---

[10]Coletta testified to living at 15 Bartlett Street, located roughly one-quarter mile from the location where Sergeant Kelly first observed the defendant.

Coletta described the jewelry in question in painstaking detail and repeatedly identified the items seized from the defendant's person as her property. Finally, we note again that none of the evidence seized as a result of the patfrisk, and which the defendant claims was improperly admitted at trial, pertained to the receiving stolen property charge of which the defendant was convicted. Unlike the stolen jewelry identified by Coletta, the other items had no probative value. Taken together, the admissible evidence was sufficiently "powerful as to neutralize" the evidence complained about. *Commonwealth* v. *Dagraca, supra* at 555. Coletta's testimony, unrebutted by the defendant, that the items found in the defendant's possession were stolen from her residence, coupled with the defendant's implausible explanation for their presence on his person, suffices to render the evidence, even were it inadmissible, harmless beyond a reasonable doubt.[11]

*Judgment affirmed.*

BROWN, J. (concurring). I have no major substantive disagreement with the majority's carefully crafted analysis of the circumstances presented here. I do, however, think that in the course of the legitimate "threshold" inquiry,[1] when the totality of the circumstances are viewed in the light of reasonableness, there was probable cause to arrest the defendant either prior to or immediately after the patfrisk. See *Commonwealth* v. *Vynorius,* 369 Mass. 17, 23 (1975). See *ante* at note 9. The analysis

---

[11]The defendant also alleges that the trial judge improperly instructed the jury on reasonable doubt, thereby impermissibly shifting the burden of proof to the defendant. We note that the judge read the Superior Court model jury instruction verbatim, and the defendant did not object. To the extent that we do not address this contention, "[it] 'ha[s] not been overlooked. We find nothing in [it] that requires discussion.' " *Department of Rev.* v. *Ryan R.,* 62 Mass. App. Ct. 380, 389 (2004), quoting from *Commonwealth* v. *Domanski,* 332 Mass. 66, 78 (1954).

[1]In passing, I note that the officer possessed reasonable suspicion of criminal activity (burglary of the O'Toole residence) that justified the stop. As to the patfrisk, given the crime under investigation (unarmed burglary), the hour, and the fact that Sergeant Kelly was alone when he first encountered the suspect, the facts tend to support the propriety of a patfrisk. See *Commonwealth* v. *Vesna San,* 63 Mass. App. Ct. 189, 192-193 (2005).

of circumstances such as those presented here, in my view, turns on the type of crime under investigation — here, a person suspected of having broken into a home.

Although I do not factor in the so-called high-crime area in my analysis, I do rely on the report of a recent (one hour earlier) burglary in the vicinity and the location (i.e., an area well known for burglaries) of the defendant at 1:30 A.M.,[2] and his quick reversal of his direction of travel; his attempt to evade the officer and conceal a flashlight, see *Commonwealth* v. *Rivera*, 27 Mass. App. Ct. 41, 44 (1989); and his having been implicated in, and convicted of, past burglaries. Contrast *Commonwealth* v. *Martin*, 457 Mass. 14, 20-21 (2010), where the Supreme Judicial Court opined that more than merely being out and about was required to seize or search a person.

If I am correct, no further inquiry into the officer's actions is necessary.[3] "I concur in the result, however, because the Commonwealth does not argue here (nor did it argue below) that there was probable cause to arrest the defendant. See *Commonwealth* v. *Bettencourt*, 447 Mass. 631, 633-634 (2006) (arguments not raised by Commonwealth in connection with motion to suppress at trial level will not be considered on appeal as basis for reversal of decision allowing defendant's motion)." (Footnote omitted.) *Commonwealth* v. *Griffin*, ante 124, 131 (2011) (Wolohojian, J., concurring).

In sum, I believe *Commonwealth* v. *Johnson*, 6 Mass. App. Ct. 944, 945-946 (1978), and *Commonwealth* v. *Santiago*, 53 Mass. App. Ct. 567, 571 (2002), provide the relevant factual scenarios and articulate controlling legal principles.

---

[2]The officer certainly could factor into his evaluation of the circumstances the time of night "in a vicinity where breaks had occurred." *Commonwealth* v. *Matthews*, 355 Mass. 378, 381 (1969).

[3]I note the consent to search is controlled by *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 179 (1980).