SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. ADONIS CARVAJAL

 
 Docket:
 SJC-13728
 
 
 Dates:
 May 5, 2025 - August 28, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Essex
 

 
 Keywords:
 Rape. Youthful Offender Act. Deoxyribonucleic Acid. Evidence, Buccal swab. Search and Seizure, Buccal swab, Probable cause, Fruits of illegal search. Probable Cause. Constitutional Law, Probable cause. Practice, Criminal, Instructions to jury, Verdict. Words, "Serious bodily injury."
 
 

       Indictments found and returned in the
Essex County Division of the Juvenile Court Department on January 7, 2019.
      A motion to compel the defendant to
provide a deoxyribonucleic acid sample was heard by Kerry A. Ahern, J., and the
cases were tried before her.
      The Supreme Judicial Court on its own
initiative transferred the case from the Appeals Court.
      Chaleunphone Nokham for the defendant.
      Kathryn L. Janssen, Assistant District
Attorney, for the Commonwealth.
      Taylor Henley & Sarah LoPresti,
Committee for Public Counsel Services, for youth advocacy division of the
Committee for Public Counsel Services & another, amici curiae, submitted a
brief.
      GEORGES, J.  On a November morning in 2018, three males
broke into a home in Methuen.  During the
home invasion, one of them raped the victim. 
Subsequent investigation led to the arrest of Adonis Carvajal, then a
juvenile.  After taking him into custody,
police subjected him to a buccal swab[1] to obtain a sample of his
deoxyribonucleic acid (DNA) -- without a warrant.
      The Commonwealth later conceded that this
initial swab was unlawful, and a Juvenile Court judge suppressed the resulting
DNA evidence.  Nonetheless, following the
defendant's indictment as a youthful offender on multiple charges, the same
judge granted the Commonwealth's motion to compel a second buccal swab.  The DNA evidence originating from that second
swab was admitted at trial.  The
defendant was convicted of aggravated rape and other offenses.
On
appeal, the defendant challenges the order compelling a second DNA sample and
the jury instructions on "serious bodily injury" as an element of
aggravated rape.  We discern no error in
the judge's determination that the Commonwealth established probable cause to
support the compelled postindictment DNA collection, and we affirm that order.
Although
the jury instructions were not erroneous, the general verdict does not reveal
which theory the jury accepted in finding the defendant guilty of aggravated
rape.  Because one of the alternate
theories was not supported by sufficient evidence, the conviction cannot stand.  Accordingly, we vacate the conviction of
aggravated rape and remand the matter to the Superior Court.  On remand, the Commonwealth may elect to
proceed to sentencing on the lesser included offense of rape or retry the
defendant on the aggravated rape charge limited to the underlying felony
theory.[2]
Background.  We begin with a summary of the evidence the
jury could have found, reserving a fuller account of the facts for our analysis
of the defendant's claims.
1.  Underlying crime.  On the morning of November 27, 2018, the victim
was alone in her second-floor apartment in Methuen.  She awoke to the sound of voices and
footsteps approaching her bedroom.  Three
hooded males -- later identified as the defendant, Jonathan Thompson, and a
juvenile -- entered the room, telling the victim, "Don't look at us,"
and "Don't scream."  Although
the victim did not see any weapons, she noticed a "big bulge" in the
pocket of one of the intruders -- presumed to be the defendant -- who wore
"a gray and green jacket," appeared "a little heavier" than
the others, and "had a beard."
      After the intruders demanded that she
"[g]et the jewelry, get the money and the drugs," the victim pointed
out the location of her jewelry but said that there were no drugs or money.  When asked whether her husband had "a
Mercedes Benz," she explained that the men "had made a mistake"
-- that the car belonged to a neighbor in a different building.[3]  Realizing their mistake, the defendant and
the juvenile left, while Thompson stayed behind to watch the victim.  After the juvenile and the defendant
unsuccessfully attempted to break into the correct apartment, the defendant
returned to the victim's apartment. 
There, he switched places with Thompson, who joined the juvenile outside
of the neighboring apartment.
      Alone with the victim, the defendant
asked, "Now, what am I going to do with you?"  He told her she needed "to give [him]
something" in exchange for not reporting him.  Still noticing the "bulge" in his
pocket, the victim began to cry and promised not to tell anyone.  The defendant responded, "[T]hat [is]
not enough," and began touching her breasts.  He ordered her to "get on all
fours."  When she refused, he
exposed himself, touched his penis, grabbed her hand, and demanded she
"touch him."  After she complied,
he grabbed her hair and forced his penis into her mouth.  He then ejaculated into her mouth, and she
"spat [the ejaculate] out to the side."  He demanded that she clean him, but she was
too shaken to move.  He then instructed
her to lock herself in the bathroom for ten to fifteen minutes.  She complied.
      Meanwhile, the juvenile and Thompson
successfully broke into the neighboring apartment; stole clothes, jewelry, and
shoes; and returned to Thompson's vehicle.[4] 
The juvenile then sent a text message to the defendant indicating that
it was "time to go."  About ten
minutes later, the defendant rejoined them and said, "I hit
that."  
      After some time, the victim left the
bathroom and called her husband; it was 10:11 A.M.  Her husband contacted the police.  Methuen police officers responded and
interviewed the victim.  Additionally,
personnel from the State police crime laboratory -‑ including a civilian
analyst and sworn officers -- processed the crime scene and collected two swabs
of biological material from the location the victim identified as the area
where she had spat out the assailant's ejaculate.  These samples were obtained before the
defendant had been identified as a suspect. 
The subsequent investigation led to his identification, arrest, and
indictment as a youthful offender for aggravated rape and other offenses.
      2. 
Motion to compel DNA sample.  As
noted above, following the defendant's arrest, police obtained a DNA sample
through a warrantless buccal swab. 
Before trial, the defendant moved to suppress that evidence, and the
motion was allowed without opposition from the Commonwealth.  Years after the initial buccal swab, the
Commonwealth moved to compel the defendant to submit to a second,
postindictment buccal swab.  
      The Commonwealth supported its motion with
an assistant district attorney's affidavit describing the investigation.  In the affidavit, which the motion judge
credited, the assistant district attorney averred that she did not "rely
on the DNA standard improperly obtained from the [defendant]."  Exhibits attached to the affidavit included
(1) a laboratory report detailing the DNA profile developed from the sperm
collected from the crime scene prior to the defendant's identification and
arrest, (2) a still image from doorbell camera footage showing an individual
matching the victim's description of her assailant, and (3) a photograph from
the social media profile of an individual named "Fatboy Amoney." 
      At an evidentiary hearing on the motion,
the Commonwealth called two witnesses. 
The first, a Methuen police officer, testified that during the
investigation officers recovered footage from a doorbell camera mounted outside
the neighboring apartment.  The
recording, captured on the day of the rape, showed a male individual matching
the victim's description of her assailant -- i.e., "a heavier set"
male wearing a "white, blue, green type of jacket."  A still image of this individual was admitted
in evidence.  
      The Methuen officer further testified that
a fingerprint recovered from the second break-in location -- the neighboring
apartment -- was matched to Thompson. 
Based on this identification, officers proceeded to the address listed
on Thompson's driver's license and probation records.  There, they found Thompson seated in a
running vehicle that matched one captured in the doorbell camera footage.  As officers approached, a passenger got out
of the vehicle, fled, and threw a firearm over a nearby fence.  Both Thompson and the passenger, later
identified as the juvenile, were apprehended.[5]  
      While in custody, Thompson and the
juvenile admitted to breaking into both the victim's and the neighboring
apartment. In their recorded interviews, which were admitted as exhibits at the
evidentiary hearing, they identified the defendant as the third
accomplice.  They referred to him by the
name "Anthony," as well as nicknames "A Money" and
"FatBoy," and stated that he lived on a particular street in Lawrence.  Police searched a popular social media
website and located a profile under the name "Fatboy Amoney."  A photograph taken from the social media
profile, admitted in evidence at the evidentiary hearing, depicts a man wearing
a jacket identical to the one seen in the doorbell camera footage and described
by the victim.  
      Methuen police, with assistance from the
Lawrence police department as described below, confirmed that the defendant
resided on the Lawrence street identified by Thompson and the juvenile.  The police then obtained and executed
warrants for the defendant's arrest and search of his residence.  At the defendant's home, police recovered the
jacket seen in both the doorbell camera footage and social media photograph, as
well as other items reported stolen from the neighboring apartment.  
      The second witness to testify at the
evidentiary hearing, a Lawrence police department employee, described that
department's electronic report management system, which was used to identify
the defendant as the third participant and to locate his address.  The witness explained that the system allows
users to search by street name or nickname and retrieve any reports referencing
those terms.  By searching the street
name associated with the defendant's address and known nicknames, officers were
able to identify the defendant and confirm his residence.  
      Following the evidentiary hearing, the
judge -- who had previously allowed the defendant's motion to suppress and
later presided over the trial -- granted the Commonwealth's motion to compel a
second buccal swab.  The defendant
complied with the order, and the resulting DNA evidence was admitted at
trial.  
      3. 
Procedural history.  The defendant
was indicted as a youthful offender on six charges, including aggravated rape
in violation of G. L. c. 265, § 22 (a).[6]  Following a jury trial in the Juvenile Court,
he was found guilty of aggravated rape, home invasion, and two counts of
daytime breaking and entering with intent to commit a felony, one involving
placing a person in fear.  In a
subsequent jury-waived trial, the defendant was adjudicated a youthful
offender.  The judge sentenced him to
from eighteen to twenty years in State prison on the aggravated rape
conviction, followed by concurrent five-year probationary terms on the
remaining convictions.  
      The defendant timely appealed, and we
transferred the case from the Appeals Court on our own motion.  
      Discussion.  1. 
Buccal swab.  Generally, once an
indictment has been returned, the Commonwealth may obtain a buccal swab from a
defendant upon a showing of probable cause -- specifically, by demonstrating
"that the sample sought will probably provide evidence relevant to the
question of the defendant's guilt." 
Commonwealth v. Maxwell, 441 Mass. 773, 778-779 & n.10 (2004).  This showing may be made through affidavits
and supporting documentary evidence, as appropriate to the circumstances and
subject to judicial discretion.  Id. at
779.  In addition, the defendant is entitled
to an adversarial hearing before the order may issue.  Id.    
      Although the defendant argues that the
second, court-ordered buccal swab must be suppressed as the inadmissible
"fruit" of the initial, warrantless collection of his DNA, we are not
persuaded.  The proper inquiry is not
whether the prior illegality can be undone, but whether the subsequently seized
evidence has been obtained "by means sufficiently distinguishable to be
purged of the primary taint." 
Commonwealth v. Frodyma, 393 Mass. 438, 441 (1984), quoting Wong Sun v.
United States, 371 U.S. 471, 488 (1963). 
Here, the second buccal swab rests on precisely such a distinguishable
foundation:  a valid postindictment court
order supported by probable cause.  
      Although DNA is often characterized as
immutable, see Commonwealth v. Gaynor, 443 Mass. 245, 256 (2005) ("DNA
remains the same no matter how many times [it] is . . . tested"
[citation omitted]), this characterization reflects its practical constancy
rather than absolute biological immutability. 
This consistent nature enables DNA to serve as a reliable identifier
over time.  Nonetheless, the enduring
nature of DNA does not render all subsequent collections after an initial
unlawful collection presumptively tainted. 
A second DNA sample obtained pursuant to a lawful postindictment order,
supported by an independent probable cause determination, constitutes a
distinct (and admissible) item of evidence. 
See Commonwealth v. Pinney, 97 Mass. App. Ct. 392, 402 n.8 (2020), S.C.,
487 Mass. 1029 (2021) (noting that while buccal swab obtained after unlawful arrest
was suppressed, "[n]othing in our decision should be interpreted as
prohibiting the Commonwealth from seeking a court order for the defendant's
buccal swab on remand.  Such an
application, of course, cannot rely on evidence suppressed under our decision").  
      The practical constancy of DNA is legally
irrelevant where the subsequent collection is based on a constitutionally valid
process, independent of any prior illegality. 
As we have emphasized, evidence is not rendered "sacred and
inaccessible" merely because it follows an unlawful seizure.  Frodyma, 393 Mass. at 441, quoting Nix v.
Williams, 467 U.S. 431, 441 (1984).  See
Commonwealth v. Nickerson, 79 Mass. App. Ct. 642, 647 (2011).  
      We are guided by Justice Lowy's apt
analysis in Commonwealth vs. Pinney, Supreme Judicial Ct., No. SJ-2021-0085
(Mar. 29, 2021), where, in a closely analogous circumstance, he concluded that
the legality of the preindictment sample becomes moot once that sample is
suppressed.  "This is
. . . no longer a suppression issue," he wrote, where a second
sample is lawfully sought, postindictment, based on evidence independent of the
first buccal swab.  Id.    
      Similarly, the Supreme Court of New Jersey
has held that a fresh DNA sample, obtained through lawful means, retains its
character as "evidence in its own right" (emphasis in original).  State v. Camey, 239 N.J. 282, 308-310
(2019).  "Notwithstanding the immutability
of DNA information," the court wrote, "the second buccal swab does
not lose its character as a second search and seizure merely because the new
buccal evidence will provide the same uniquely identifying information
. . . that the initial buccal evidence provided."  Id. at 289.
      These persuasive authorities recognize a
key point:  the constitutional exclusion
of one item of evidence does not bar the Commonwealth from later obtaining
similar evidence through lawful means, provided it is supported by an
independent and sufficient evidentiary basis. 
Simply put, where a defendant's DNA sample was initially obtained
unlawfully, the exclusionary rule does not impose a blanket prohibition on all
future access to the defendant's DNA; rather, it bars only the use of evidence
that exploits that initial illegality. 
That distinction is dispositive here. 
The evidentiary record confirms that the subsequent collection of DNA
was based on independent, lawful grounds, untainted by the prior
violation.  
      In seeking the second swab, the
Commonwealth submitted a credited affidavit from an assistant district attorney
who had reviewed the relevant reports and interviewed both investigating
officers and percipient witnesses.  The
affidavit expressly stated that the prosecutor did not rely on the previously
obtained DNA profile in moving to compel the second sample.  Instead, the motion was supported by
independent evidence, including a forensic report analyzing the DNA profile
generated from sperm recovered from the victim's bedroom floor that was
obtained before the defendant was identified, arrested, or subjected to the
initial unlawful buccal swab.  
      Moreover, evidence was presented that
visually connected the defendant to the victim's assailant.  According to the testimony of the Methuen
officer who helped prepare the warrant for the defendant's residence, the
victim described her attacker as a heavier-set male wearing a white, blue, and
green jacket.  This description was
consistent with one of the individuals captured on the doorbell camera footage,
as could be seen in the still image taken from the footage.  The jacket in the image not only appeared to
be the same one the defendant wore in his social media profile photograph, but
also matched the jacket later recovered from the defendant's home, further
corroborating his identity as the suspect. 

      Information obtained from the other
participants in the home invasion also linked the defendant to the crime.  In their recorded interviews conducted the
day after the assault, Thompson and the juvenile both identified the defendant
as the third participant -- by name, nickname, and street address.
Specifically, they referred to him as "Fatboy" and "A
Money" -- nicknames linked to the defendant's social media account and
corresponding images -- and told police that he lived in Lawrence.  Finally, combining the testimony of the
Methuen officer with that of the Lawrence police department employee, the
witnesses explained that, through coordination with the Lawrence police
department and the use of its electronic records system, they were able to identify
the defendant by his legal name and confirm his address.  
      Based on this evidence, the motion judge
concluded that the Commonwealth had satisfied its burden under Maxwell,
establishing probable cause to believe that a second DNA sample would likely
yield evidence relevant to the question of the defendant's guilt.  The judge appropriately found that this new
request was rooted in lawfully obtained, independent evidence and not
derivative of the suppressed DNA profile. 
We discern no error in that conclusion.  

      Finally, because the second buccal swab
was obtained pursuant to a court order supported entirely by evidence untainted
by the initial illegality, the exclusionary rule does not apply.[7]  That rule -- designed to deter constitutional
violations by suppressing illegally obtained evidence -- bars the admission not
only of the unlawfully obtained item itself, see Commonwealth v. Fredericq, 482
Mass. 70, 78 (2019), but also of its derivatives, see Wong Sun, 371 U.S. at
488.  
      Here, the Commonwealth did not seek to
admit the original, unlawfully obtained buccal swab, nor evidence derived from
it.  Instead, it introduced a second swab
obtained through an independent, constitutionally sound process:  a court order based on probable cause
developed from sources wholly unrelated to the initial misconduct.  Although the DNA profile obtained from the
second swab is biologically identical to that derived from the first, the
second swab constitutes a distinct item of evidence lawfully acquired through
an independent legal process -- not the same evidence as the first swab.  
      The doctrines of independent source and
inevitable discovery apply where the Commonwealth seeks to admit the same
evidence initially discovered through unlawful means but can later demonstrate
that the evidence either would have been or, in fact, was obtained through a
constitutionally sound process.  For
example, in Commonwealth v. Wilson, 486 Mass. 328, 335-337 (2020), the independent
source exception permitted admission of evidence seized under a warrant
untainted by a prior unlawful search for the same information.  Similarly, in Commonwealth v. Estabrook, 472
Mass. 852, 865, 870 (2015), S.C., 496 Mass.     (2025), a lawful
warrant authorized seizure of the very evidence previously viewed in an
earlier, invalid search.  
      The same is true of the inevitable
discovery doctrine.  In Commonwealth v.
O'Connor, 406 Mass. 112, 114-115 (1989), we affirmed admission of a plastic bag
unlawfully seized because it would inevitably have been found moments later
during a valid inventory search.  See
Commonwealth v. Hernandez, 473 Mass. 379, 386-387 (2015) (inevitable discovery
exception applied to same evidence obtained from what was otherwise unlawful
search); Commonwealth v. Linton, 456 Mass. 534, 557-559 (2010), S.C., 483 Mass.
227 (2019) (same).  In each of these
cases, the Commonwealth was permitted to introduce the same evidence initially
discovered unlawfully but later shown to be independently or inevitably discovered
through lawful means.  
      This case is fundamentally different.  Here, the Commonwealth initiated a new
evidentiary process, rooted in constitutionally obtained evidence, to collect a
distinct sample.  Although the initial
buccal swab of the defendant was unlawfully gathered, that unlawful search does
not require the exclusion of the DNA evidence obtained as a result of a second,
different buccal swab gathered through an independent and lawful chain of
events.  Because the second buccal swab
was not obtained through the exploitation of the earlier constitutional
violation, the exclusionary rule –- and, by extension, its exceptions -- are
simply inapplicable.  
      2. 
Jury instruction.  Having
concluded that the DNA evidence was properly admitted, we turn to the
defendant's challenge to the jury instructions. 
He contends that the judge erred by failing to define "serious
bodily injury" as an aggravating factor for rape.[8]  
      We disagree.  The statutory definition the defendant
invokes -- drawn from the assault and battery statute, G. L. c. 265,
§ 13A (c) -- does not apply to aggravated rape under G. L.
c. 265, § 22 (a), and the judge's instructions accurately
reflected the applicable law.[9]  
      We evaluate jury instructions as a whole
to determine how a reasonable juror would understand them.  Commonwealth v. Young, 461 Mass. 198, 207
(2012).  While trial judges are not
required to use any particular phrasing, the instructions must convey the
correct legal standard.  Commonwealth v.
Marrero, 427 Mass. 65, 72 (1998), S.C., 493 Mass. 338 (2024).  Furthermore, "[i]nstructions that convey
the proper legal standard . . . are deemed correct" (citation
omitted).  Commonwealth v. Adams, 495
Mass. 600, 607 (2025).  
      Here, the judge properly instructed the
jury.  See Massachusetts Superior Court
Criminal Practice Jury Instructions § 3.1.1(d) (Mass. Cont. Legal Educ. 3d
ed. 2018).[10]  See also Adams, 495 Mass.
at 607.  Neither G. L. c. 265,
§ 22, nor the Superior Court instructions define "serious bodily injury,"
and the term is not so obscure as to require further explanation.  Cf. Commonwealth v. The Ngoc Tran, 471 Mass.
179, 186-187 (2015) (term "mental impairment" need not be defined in
jury instruction).  
      We decline the defendant's invitation to
graft the definition of "serious bodily injury" from the assault and
battery statute, G. L. c. 265, § 13A (c), onto the aggravated
rape statute, G. L. c. 265, § 22 (a).  The statutory history forecloses such an
approach.  The Legislature added
"serious bodily injury" as an aggravator in the rape statute in
1980.  See St. 1980, c. 459,
§ 6 (enacting new definition of forcible rape that included serious bodily
injury as aggravating factor).  By
contrast, the definition of "serious bodily injury" in
§ 13A (c) was not enacted until 2002 -- more than two decades
later.  See St. 2002, c. 35,
§ 1.  Had the Legislature intended
to align the meaning of the term across statutes, it could have done so at that
time or in the years since.  It has not.
      Moreover, long before the enactment of
§ 13A (c), Massachusetts courts consistently recognized that injuries
such as abrasions, bruising, and physical pain, sufficed to establish the
"serious bodily injury" aggravating factor under § 22 (a).  See, e.g., Commonwealth v. Pontes, 402 Mass.
311, 319 n.7 (1988) (abrasions on victim's head and lower abdominal pain
sufficient to establish serious bodily injury); Commonwealth v. Coleman, 30
Mass. App. Ct. 229, 235 (1991) (jury could have found "swollen eye,
swollen face, and facial bruises" constituted serious bodily injury);
Commonwealth v. Sumner, 18 Mass. App. Ct. 349, 352, 354 (1984) (bruises and
scrapes on victim sufficient to establish serious bodily injury).  
      That settled interpretive history confirms
that the term, as used in the aggravated rape statute, stands on its own and
need not mirror the later-adopted definition in an unrelated statute.  Had the Legislature intended to define
"serious bodily injury" in the context of aggravated rape, it could
have amended § 22 (a) accordingly -- but it has not done so, despite
adopting multiple other amendments in the almost fifty years since the law's
enactment.  See Commonwealth v. J.G., 100
Mass. App. Ct. 731, 737–738 (2022).  See
also Commonwealth v. Fleury, 489 Mass. 421, 427 (2022) ("We presume that
the Legislature enacts legislation with an aware[ness] of the prior state of
the law as explicated by the decisions of this court" [quotation and
citation omitted]).  Accordingly, the
judge did not err by declining to define "serious bodily injury" in
the aggravated rape jury instructions.[11]
      However, the absence of instructional
error does not resolve all concerns, as a distinct issue -- apparent from the
record -- compels us to vacate the aggravated rape conviction.  See Commonwealth v. Simpson, 428 Mass. 646,
648-649 (1999) (appellate court may consider issue apparent on record).  The Commonwealth proceeded on three
aggravating theories: (1) serious bodily injury, (2) commission during an
underlying felony, and (3) joint enterprise. 
The jury returned a verdict without specifying which theory it adopted.
      When a general verdict may rest on
multiple theories, at least one of which is unsupported by sufficient evidence,
the conviction cannot stand unless the record demonstrates that the jury
"necessarily and unavoidably" relied on a theory supported by
sufficient evidence.  Commonwealth v.
Plunkett, 422 Mass. 634, 638 (1996).  See
Commonwealth v. Quiles, 488 Mass. 298, 308-309 (2021), cert. denied, 142
S. Ct. 1237 (2022).  
      In this case, while the evidence was
sufficient to support the aggravating factor of an underlying felony,[12] it
did not support the other two alternative theories of aggravated rape submitted
to the jury.  Specifically, there was
insufficient evidence to support a joint enterprise theory.  The victim testified unequivocally that the
defendant alone committed the rape.  See
Commonwealth v. Jansen, 459 Mass. 21, 27–28 (2011) (no joint enterprise where
evidence was insufficient that sexual acts amounted to "united
act").  See also Commonwealth v.
Medeiros, 456 Mass. 52, 60 (2010) (Commonwealth must prove beyond reasonable
doubt that at least two individuals committed rape to establish joint enterprise).  
      Nor does the record support the theory
that the rape resulted in serious bodily injury.  Although not dispositive, the victim gave no
testimony -- on either direct or cross-examination -- that she sustained any
physical harm.  The only reference to a
possible injury appears in the victim's medical record, admitted as a trial
exhibit, which notes that the victim "endorse[d] a mild
headache."  However, the same record
also reflects the victim's statement to medical personnel that "there was no
physical assault."  While courts
have recognized that serious bodily injury can exist even in the absence of
life-threatening harm,[13] the evidence here falls short.  A brief, unelaborated reference to a mild
headache -- uncorroborated by testimony or clinical context -- is insufficient
to establish beyond a reasonable doubt that the rape caused serious bodily
injury.  See Commonwealth v. McCourt, 438
Mass. 486, 497 (2003).  
      Because the jury were instructed on all
three alternative theories of aggravated rape, only one of which was supported
by the evidence, and the general verdict does not disclose which theory the
jury adopted, the conviction cannot stand. 
Plunkett, 422 Mass. at 638 ("the general rule in the Commonwealth
is that there must be a new trial if, as here, a jury, given two theories of guilt,
returned a general verdict, and the evidence supported a guilty verdict on only
one of those theories"); Commonwealth v. Kickery, 31 Mass. App. Ct. 720,
724 (1991), overruled on other grounds by McCourt, 438 Mass. at 496 n.12.  
      Although the evidence was insufficient to
support the aggravated rape conviction, it does support the lesser included
offense of rape.  See Commonwealth v.
French, 462 Mass. 41, 47 (2012) ("Any failure as to the element of
aggravation [in aggravated rape] does not affect the lesser included
offense").  Accordingly, we vacate
the conviction of aggravated rape and remand the matter to the Superior
Court.  On remand, the Commonwealth may
elect to proceed with sentencing on the lesser included offense of rape or to
retry the aggravated rape charge, limited to the underlying felony theory, the
only theory for which there was sufficient evidence at the first trial.  See Commonwealth v. Morrison, 494 Mass. 763,
775 n.12 (2024); Commonwealth v. Niemic, 483 Mass. 571, 599 (2019); Kickery, 31
Mass. App. Ct. at 725.
      Conclusion.  We affirm the order compelling postindictment
DNA collection.  The conviction of
aggravated rape is vacated, and the case is remanded to the Superior Court for
further proceedings consistent with this opinion.
So ordered.

footnotes

[1] "A
buccal swab 'involves the rubbing of a swab on the interior surface of the
cheek.'"  Commonwealth v. Maxwell,
441 Mass. 773, 774 n.1 (2004), quoting Doe v. Senechal, 431 Mass. 78, 79 n.4,
cert. denied, 531 U.S. 825 (2000).  

[2] We
acknowledge the amicus brief in support of the defendant submitted by the youth
advocacy division of the Committee for Public Counsel Services and Citizens for
Juvenile Justice.  

[3] Another
apartment building was located directly in front of the victim's apartment,
with the two buildings sharing a driveway.

[4] The
defendant, Thompson, and the juvenile had driven to the victim's home together.

[5] According to
the assistant district attorney's affidavit, Thompson was wearing shoes
reported stolen from the neighboring apartment. 

[6] The defendant
was also charged with home invasion, in violation of G. L. c. 265,
§ 18C; breaking and entering in the daytime with the intent to commit a
felony and placing a person in fear, in violation of G. L. c. 266,
§ 17 (as to the victim's apartment); breaking and entering in the daytime
with the intent to commit a felony, in violation of G. L. c. 266,
§ 18 (as to the neighboring apartment); larceny of property with a value
over $1,200, in violation of G. L. c. 266, § 30 (1); and
carrying a firearm without a license, in violation of G. L. c. 269,
§ 10 (a).  At trial, the
larceny charge was dismissed after the Commonwealth conceded there was insufficient
evidence as to the value of the items taken, and the defendant was found not
guilty of carrying a firearm without a license.

[7] In allowing
the motion to compel the second buccal swab, the judge alternatively relied on
the inevitable discovery exception to the exclusionary rule, finding the
defendant's DNA would have been discovered by lawful means and that applying
the exception would not undermine the deterrent purpose of the exclusionary
rule.
      On appeal, the defendant contends that the
inevitable discovery doctrine is inapplicable because buccal swabs are not
routinely performed by police and are typically used only to advance
investigations against a particular suspect. 
The Commonwealth responds that discovery of the defendant's DNA was
inevitable, as probable cause existed and a court order could have been
obtained.  However, the Commonwealth
primarily relies on the independent source doctrine, which permits admission of
evidence initially discovered through unlawful means but later acquired
independently and untainted -- such as the postindictment swab here.

[8] The judge
instructed the jury, in relevant part:   

"This is an
aggravated rape, which is a more serious form of rape, and it requires the
Commonwealth to prove a third element beyond a reasonable doubt.  In order to prove the defendant guilty of
aggravated rape, the Commonwealth must prove beyond a reasonable doubt that the
rape resulted in or was committed with acts resulting in serious bodily injury
. . . ."  

[9] The
Commonwealth contends that the defendant's claim is unpreserved because he did
not object to the jury instruction on aggravated rape as given, nor did he
request any additional instruction on serious bodily injury as an aggravating
factor for aggravated rape.  The
defendant instead requested instruction on the "serious bodily harm"
element under the youthful offender statute. 
"We need not decide whether the defendant's claim of error was
preserved, because we conclude there was no error."  Commonwealth v. Benson, 453 Mass. 90, 94 n.4
(2009).  

[10] The Superior
Court jury instruction for aggravated rape states, in relevant part:    
"The
defendant is also charged with aggravated rape. 
Aggravated rape is a more serious offense than rape, and it requires the
Commonwealth to prove one additional element beyond a reasonable doubt.  In order to prove the defendant guilty of
aggravated rape, the Commonwealth must prove beyond a reasonable doubt that the
rape resulted in or was committed with acts resulting in serious bodily
injury . . . .  
"[It is for
you to determine whether (the complainant/name) was raped with acts resulting
in serious bodily injury.]" 
(Footnotes omitted.)
Massachusetts
Superior Court Criminal Practice Jury Instructions § 3.1.1(d) (Mass. Cont.
Legal Educ. 3d ed. 2018).

[11] The
defendant further argues that the trial court's instruction on "serious
bodily harm" under the youthful offender statute confused or misled the
jury regarding the Commonwealth's burden to prove "serious bodily
injury" as an aggravating factor for aggravated rape.  We disagree. 
Before addressing "serious bodily harm," the judge made clear
that the instruction pertained to the elements of a youthful offender
adjudication.  The court then described
what would constitute "serious bodily harm" in that context.  Assuming without deciding that "serious
bodily harm" and "serious bodily injury" are distinct standards
-- but see Commonwealth v. J.A., 478 Mass. 385, 388 n.6 (2017) ("We use
'serious bodily harm' and 'serious bodily injury' interchangeably") -- we
presume the jury followed the judge's clear instructions and did not conflate
the two.  Commonwealth v. Jeune, 494
Mass. 808, 821 (2024).  

[12] In the jury
instructions, the judge identified two possible underlying offense:  breaking and entering with intent to commit a
felony, placing a person in fear; and unlawfully carrying a firearm.  As previously noted, the jury found the
defendant not guilty as to the latter charge.

[13] See, e.g.,
Pontes, 402 Mass. at 319 n.7; Coleman, 30 Mass. App. Ct. at 235; Sumner, 18
Mass. App. Ct. at 352, 354.